Elon Emani VALDEZ, an Infant by Her Mother and Natural Guardian, Tiffany DONELY, and Tiffany Donely, Individually, Plaintiffs–Appellants,

v.

UNITED STATES of America, Defendant–Appellee.

Docket No. 06–1333–cv.

United States Court of Appeals, Second Circuit.

Argued: Sept. 28, 2007.

Decided: Feb. 29, 2008.

Annette G. Hasapidis, Law Offices of Annette G. Hasapidis, South Salem, NY, for Plaintiffs–Appellants.

Heather K. McShain, Assistant United States Attorney (Sara Shudofsky, on the brief), Michael J. Garcia, United States Attorney for the Southern District of New York, New York, NY, for Defendant–Appellee.

Before: McLAUGHLIN and RAGGI, Circuit Judges, and KORMAN, District Judge.*

KORMAN, District Judge.

Elon Emani Valdez, a severely brain-damaged seven-year-old child, was born at St. Luke's–Roosevelt Hospital on December 13, 2000. At some point before, during, or after her birth, she had aspirated meconium—a mixture of fecal matter and amniotic fluid. The aspiration of meconium is usually caused by fetal stress, brought on by infections in the womb or labor difficulties that cause the infant's intestines to undergo increased movement, "causing meconium to pass into the surrounding amniotic fluid." MedlinePlus Medical Encyclopedia: *Meconium Aspiration Syndrome*. "If the infant breathes while still in the uterus or while still covered by this fluid after birth, the mixture can enter the lungs and partially or completely block the infant's airways," causing respiratory distress. *Id.* The brain damage Elon suffered was apparently the result of this process, which is known as Meconium Aspiration Syndrome ("MAS"), a leading cause of severe illness and death in newborns. *See id.* ("Lack of oxygen ... from complications of meconium aspiration may lead to brain damage.").

Because immediate intervention in the delivery room "can sometimes help prevent" MAS, most infants are monitored during labor for fetal distress or any sign that would indicate that the child had aspirated meconium. *Id.* If a baby is thought to have inhaled meconium, treatment will begin during delivery. Although MAS can be serious, most cases are not, and not all infants who pass meconium during labor and delivery develop MAS. Nevertheless, Elon had swallowed a "significant amount of meconium" that resulted in her immediate transfer to the neonatal intensive care unit at New York–Presbyterian Hospital. There she received nitric oxide therapy, in which oxygen was added to her ventilator to dilute the blood vessels and allow more blood-flow and oxygen to reach her lungs. She was subsequently readmitted from New York–Presbyterian to St. Luke's NICU in mid-January, 2001, for approximately two months of additional care. Because bleeding in her brain had caused her to suffer seizures and brain atrophy, Elon required a feeding-tube and Phenobarbital to treat her seizures when she was finally discharged from St. Luke's on March 10, 2001.

We provide this background, which we have gleaned from the medical records relating to Elon's postnatal care and from medical literature, because it helps place in context the principal issue raised on this appeal from the judgment of the United States District Court for the Southern District of New York (McMahon, *J.*), dismissing on statute of limitations grounds a cause of action against the United States for malpractice. While we pass over the detailed procedural history of the case that may be found in the opinion of the district court, *Valdez ex rel. Donely v. United States*, 415 F.Supp.2d 345, 347–48 (S.D.N.Y.2006), we provide some additional necessary background.

* The Honorable Edward R. Korman, Senior United States District Judge for the Eastern District of New York, sitting by designation.

Before Elon was born, her mother, Tiffany Donely, a nineteen-year-old eleventh-grade high school student, had received prenatal care from Dr. Christina Hye–Kyong Kong at the William F. Ryan Community Health Center, a federally funded healthcare facility. Dr. Kong also assisted in the delivery of Elon at St. Luke's–Roosevelt Hospital. Because of her employment at the Ryan Center, Dr. Kong was deemed to be an employee of the United States. *See* Public Health Service Act, 42 U.S.C. § 233(g)-(n) (2003). By virtue of this relationship, any malpractice cause of action had to be preceded by the filing of an administrative claim with the Department of Health & Human Services within two years after the cause of action accrued. 28 U.S.C. § 2401(b). Otherwise, the tort claim is "forever barred." *Id.*

An administrative claim was not filed on Elon's behalf within two years of her date of birth. Instead, on June 4, 2003, almost two and one-half years after her birth, within the period prescribed by the New York statute of limitations, N.Y. C.P.L.R. § 214–a (McKinney 2003), her mother, suing both individually and as her daughter's guardian, filed a complaint for alleged medical malpractice against Dr. Kong and others in New York State Supreme Court. The factual basis for the medical malpractice cause of action is not spelled out in the complaint. Because the discharge and aspiration of meconium may occur during the process of birth without medical fault, we assume the complaint is based principally on the failure to take precautions that would have avoided or mitigated the "serious, catastrophic permanent personal injuries [Elon] suffered." Amended Complaint at 3.

The complaint was subsequently removed to the United States District Court, and the United States was substituted as a party defendant. Upon the United States Attorney's motion to dismiss for failure to file an administrative claim with the Department of Health & Human Services, Ms. Donely proceeded to do so, thereafter amending her complaint. The district court, nevertheless, granted the motion to dismiss in light of plaintiffs' failure to file the administrative claim within two years after the cause of action accrued. The basis for the dismissal was that the cause of action was untimely and that the statute of limitations was not tolled by the fact that Elon's mother lacked knowledge that the William F. Ryan Community Health Center was a federally funded healthcare facility and that Dr. Kong was deemed to be a federal employee. The court found no fraudulent concealment of federal funding or employment by the United States. In any event, it concluded that the attorney for Elon's mother, whom she retained on February 12, 2002, and who was sufficiently aware of the possibility that the Ryan Center was affiliated with a government agency to undertake some effort to investigate its status, had not done enough to ascertain the pertinent facts. While these conclusions are disputed by the parties on this appeal, we identify a threshold concern: identifying the proper accrual date for plaintiffs' federal claim.

## DISCUSSION

I. *Accrual of the Federal Tort Claims Act Claim*

Although timely administrative exhaustion is a necessary prerequisite to the pursuit of a malpractice claim against the United States, the law affords some flexibility when a plaintiff who overlooks this requirement files a complaint within the prescribed time for administrative review. The failure of Elon's mother to file an administrative claim before the initial complaint was filed in state court was excusable if that complaint was filed within two

years after the cause of action accrued. 28 U.S.C. § 2679(d)(5); *see also Celestine v. Mt. Vernon Neighborhood Health Ctr.*, 403 F.3d 76, 83 (2d Cir.2005). In such circumstances, it would have been appropriate to dismiss the complaint after removal to federal court, but the law would have afforded Elon's mother sixty days from the date of dismissal to file an administrative claim and six months from the denial of her claim to recommence the lawsuit. *See* 28 U.S.C. § 2679(d)(5). Because she filed the administrative claim within sixty days after the dismissal of the complaint and refiled an amended complaint within six months of that denial, the first step in resolving this appeal is fixing the point in time at which the cause of action accrued.

■ A claim under the Federal Tort Claims Act accrues on the date that a plaintiff discovers that he has been injured. *See Kronisch v. United States,* 150 F.3d 112, 121 (2d Cir.1998). "However, . . . where plaintiff would reasonably have had difficulty discerning the fact or cause of injury at the time it was inflicted, the so-called 'diligence-discovery rule of accrual' applies. Under this rule, accrual may be postponed until the plaintiff has or with reasonable discovery should have discovered the critical facts of both his injury and its cause." *Id.*[1] The leading Federal Tort Claims Act case is *United States v. Kubrick,* 444 U.S. 111, 100 S.Ct. 352, 62 L.Ed.2d 259 (1979), in which the issue was addressed in the context of an action for medical malpractice. The plaintiff there developed a ringing sensation in his ears, along with some loss of hearing, six weeks after being treated with neomycin for an infection in his thigh bone. *Id.* at 113–14, 100 S.Ct. 352. An ear specialist who had

secured plaintiff's hospital records advised him that the loss of hearing was due to the neomycin treatment administered at the Veterans' Administration Hospital. *Id.* at 114, 100 S.Ct. 352. Despite this knowledge, the plaintiff failed to file a notice of claim within two years after being so advised. *Id.* at 115, 100 S.Ct. 352. The Supreme Court held that the cause of action accrued when the plaintiff learned that the treatment with neomycin was the cause of his injury, even though he was not advised that this treatment was a departure from prevailing medical standards. *Id.* at 123–24, 100 S.Ct. 352. Once Kubrick was "aware of his injury and its probable cause," his cause of action accrued and he had two years to file an administrative complaint. *Id.* at 118, 100 S.Ct. 352.

The Supreme Court explained its unwillingness to treat "a plaintiff's ignorance of his legal rights"—the right to sue for malpractice—in the same forgiving way that it was willing to treat his "ignorance of the fact of his injury or its cause." *Id.* at 122, 100 S.Ct. 352. The fact of injury may not manifest itself for some time after the act that caused it and "the facts about causation may be in the control of the putative defendant, unavailable to the plaintiff." *Id.* By contrast, "[t]he prospect is not so bleak for a plaintiff in possession of the critical facts that he has been hurt and who has inflicted the injury. He is no longer at the mercy of the latter." *Id.*

■ The holding in *Kubrick* mandates a threshold determination of the date that the plaintiff in a medical malpractice case learned that the injury he suffered related in some way to the medical treatment he received. Since *Kubrick,* it has become

---

1. Judge Posner has pointed out that the diligence-discovery rule may alternatively be thought of as the default rule of accrual, as in most cases the plaintiff will discover his inju-

ry on the date that it occurs. *See Cada v. Baxter Healthcare Corp.,* 920 F.2d 446, 450 (7th Cir.1990).

settled law that a medical malpractice cause of action accrues under the FTCA once an injured plaintiff has notice that the cause of his injury "is in the government's control, not a concurrent but independent cause that would not lead anybody to suspect that the government had been responsible for the injury. The notice must be not of harm but of iatrogenic [doctor-caused] harm, though, as *Kubrick* holds, not necessarily of *negligent* iatrogenic harm." *Drazan v. United States,* 762 F.2d 56, 59 (7th Cir.1985) (Posner, *J.*) (emphasis in original); *see also Hughes v. United States,* 263 F.3d 272, 276–77 (3d Cir.2001); *Goodhand v. United States,* 40 F.3d 209, 212 (7th Cir.1994) (Posner, *J.); Augustine v. United States,* 704 F.2d 1074, 1078 (9th Cir.1983).

The facts in *Drazan* provide a helpful illustration. The plaintiff's husband died of lung cancer, a fact that plaintiff knew on the date of his death. 762 F.2d at 59. While the district court ruled that the cause of action accrued on that date, the Court of Appeals reversed, holding that accrual did not occur until plaintiff requested and obtained her husband's hospital records, including an x-ray, showing that "the lung cancer might have been arrested but for the earlier failure ... to follow up on [dangerous signals]" that were revealed by the x-ray. *Id.* Judge Posner observed that the district court's approach

> would have the following rather ghoulish consequence: any time someone suffered pain or illness or death in a Veter-

ans Administration hospital, he (or in the case of death his survivors) would request his hospital records to see whether diagnosis or treatment might have played a role in his distress—whether, that is, the harm might have been "iatrogenic" (doctor-caused). He could not wait till he had reason to think he had suffered an iatrogenic harm; the two years might have run. We do not think such behavior should be encouraged, or that anything in *Kubrick* requires us to encourage it.

*Id.* Judge Posner cautioned, however, that it would be inaccurate to say that the statute of limitations begins to run only when the government cause is known. *Id.* Instead, it begins to run "when the government cause is known or when a reasonably diligent person (in the tort claimant's position) reacting to any suspicious circumstances of which he might have been aware would have discovered the government cause—whichever comes first." *Id.*[2] As this court has explained, a "claim does not accrue when a person has a mere hunch, hint, suspicion, or rumor of a claim." *Kronisch v. United States,* 150 F.3d at 121. But a plaintiff's suspicions may "give rise to a duty to inquire in the possible existence of a claim in the exercise of due diligence." *Id.*

Plainly the accrual date under the "diligence-discovery rule of accrual" was not the date that Elon was born. Indeed, the United States Attorney conceded as much in the district court. Nor was there any basis in the record to conclude that the

---

2. In *Drazan,* the medical care was rendered in a Veterans' Administration Hospital, so that once the plaintiff discovered that the cause of action was related to the medical care her husband received, she was aware that there was a "government cause." This is not the case here. Nevertheless, we do not stop to parse the significance of the distinction because our initial inquiry focuses on when Elon's mother learned of the doctor-related nature of the cause. If she did not learn of the doctor-related cause within two years before the statute of limitations accrued, it would not be necessary to address the issue of when she became aware that the government was the responsible defendant. We discuss aspects of this issue *infra* at 182–85.

accrual date was March 10, 2001, three months after Elon's birth, the alternative date suggested by the United States Attorney on the premise that it was the date by which Elon's mother "ha[d], or when with reasonable diligence should ... have discovered, the critical facts of both [Elon's] injury and its cause."

While March 10, 2001 was the date on which Elon was discharged from St. Luke's–Roosevelt Hospital, the medical records of her treatment during the preceding three months establish no more than that Elon's mother understood that she had given birth to a brain-damaged child. Indeed, as we have already observed, this condition was not necessarily related to any medical treatment. Thus, on December 14, 2000, one day after Elon's birth, a psychological assessment by a social worker contained the following entry:

> Ms. Tiffany Donley [*sic*] is a 19 [year old] first time mother seen for assessment as her newborn was transferred to [New York–Presbyterian] for medical management of meconium aspiration. Ms. Donely was comforted that her mother was accompanying baby in the ambulance. She appears to understand reason for transfer, and she expressed her concern [and] worry about the baby. However, her affect is opposite to her expressed feelings.

This entry shows no more than that Elon's mother was aware that Elon's medical condition required her to be transferred to another hospital that was better able to manage a medical condition that she had been born with. The entry does not indicate that Elon's mother was aware of the severity of the condition or that she was told that it was due to MAS or, if she was so apprised, that this term was even defined for her.

Over a month later, on January 18, 2001, Elon was readmitted from New York–Presbyterian to St. Luke's. A "psych" note recorded that "mom accompanied infant from Columbia. Oriented mom to NICU & it's [*sic*] surroundings & policies[. M]om verbalized understanding." Progress notes, from January 26, 2001, indicated that the St. Luke's NICU doctor met with Donely and her mother. The notes stated that

> [t]he purpose was to update family on baby's medical status.... [Patient Elon Valdez] also has bleeding all over brain & brain appears to be atrophying. This information explained to mother & grandmother. Mother had no questions and asked for no further clarification. [Grandmother] appeared to better understand what the implications for long term development may be as a result of bleeding on the brain.... It was difficult to assess how much [patient's] mother understood & processed as she is not very verbal.

The March 9, 2001 progress notes indicated that Elon's mother "came in updated, verbaliz[ing] understanding [and] concern. Spoke to Dr. Hochselasie [with] regards to possible discharge tomorrow. Did infant care, GT feeding did very well & is confident, + bonding." In sum, nothing in the hospital records indicate that Elon's mother had any understanding that there was a potential doctor-related cause of Elon's injury.

Particularly apposite here is a remarkably similar case, *Ex rel. Rice v. United States*, 889 F.Supp. 1466 (N.D.Okla.1995), in which the district judge denied a motion for summary judgment seeking the dismissal of a medical malpractice complaint for injuries resulting from meconium aspiration as untimely under the FTCA's two-year statute of limitations. The United States Attorney had argued that plaintiffs'

claims accrued on October 3, 1990, when Markus Rice was born. The argument was based on the fact that Markus's mother was told then that his medical problems were caused by meconium aspiration, and the term was defined for her. *Id.* at 1468–69. Consequently, the claim filed on April 23, 1993 was time-barred. *Id.* at 1467. Markus's mother argued that she did not become aware of the cause of Markus's injuries until October, 1992, when a pediatric cardiologist told her that Markus's breathing problems were caused by the fact that "he had inhaled some poop into his lungs." *Id.* at 1469. Until then, "she did not suspect that meconium aspiration [was] related to treatment at CIH [a government healthcare facility]." *Id.* The district judge held that summary judgment was not appropriate on this record. *Id.* at 1472.

Significantly, for our purposes, the district judge held that, while Markus had suffered an injury before April 23, 1991, two years prior to filing the complaint, *id.* at 1470, the facts surrounding Rice's injury did not give rise to a "clear inference that the injury could be traced to the treatment provided." *Id.* Considering the evidence in the light most favorable to plaintiff, the district judge determined that it was not unreasonable, under the circumstances, for Ms. Rice not to know or inquire about a potential relationship between the injury suffered and actions or omissions by doctors and nurses at the time of delivery. *Id.* at 1471. "When a doctor reports that a person is 'born with' a problem, it could

reasonably have the effect of leading a person to believe that the injury was completely unavoidable." *Id.* Moreover, the district judge held that, even if Ms. Rice understood that Markus swallowed meconium, it did not "necessarily demonstrate the knowledge required under the statute." *Id.* at 1472. Knowing that meconium aspiration caused the breathing disorder is not the same as "linking the injury to treatment." *Id.* Because there was no direct evidence that Ms. Rice was ever told of or had reason to suspect a potential relationship between the injury and Markus's treatment, the district judge held that dismissal of the case without additional development of the factual record was inappropriate. *Id.*[3] The same disposition is appropriate here.

■ We know that by February 12, 2002, fourteen months after Elon was born, her mother had sufficient knowledge of the possible iatrogenic cause of the injury to seek legal assistance. Were February 12, 2002, the accrual date of plaintiffs' claim, the June 4, 2003 filing of the state law complaint would be timely under the FTCA. We cannot, however, reach that conclusion because the record is silent with respect to the circumstances that led Ms. Donely to seek legal assistance. Nor does it indicate how long she had delayed in seeking legal advice after she had reason to suspect that the cause of Elon's injury was related to her medical treatment. While these issues need to be resolved on remand, *see Drazan,* 762 F.2d at 60, we

---

**3.** After the record in *Rice* was fully developed, the district court dismissed the complaint. Ms. Rice testified that, once she was told that meconium aspiration was the cause of Markus's problems, she understood it related to his treatment. *Rice v. United States,* 116 F.3d 1489 (Table), 1997 WL 353009, at *2 (10th Cir. June 26, 1997) (unpublished). The only issue at trial was when she was first so apprised. The district court did not credit her testimony on this score. *Id.* at *3. While the dismissal was affirmed, the Court of Appeals left open the issue of whether "[k]nowledge that a child's respiratory problems were caused by meconium aspiration, rather than heredity, may ... lead a reasonably diligent person to suspect, or inquire into, a causal connection between the injury and medical treatment received." *Id.* at *5 n. 10.

again note the concession of the United States Attorney that, under the "diligence-discovery rule of accrual," the statute of limitations did not begin to run until at least March 10, 2001, almost three months after Elon was born. If discovery were to indicate that, despite reasonable diligence, Elon's mother did not, in fact, learn about the cause of injury until June 3, 2001, the complaint would have been timely filed. Since we reject the "ghoulish" suggestion—to borrow Judge Posner's word—that due diligence demanded a reasonable person in the position of Elon's mother commence a malpractice investigation immediately upon Elon's birth or even her discharge from St. Luke's Hospital, such a claim would not have necessarily accrued on either of those dates, and the motion to dismiss should be denied on remand unless the record establishes some significant omission beyond Ms. Donely's failure to make a malpractice inquiry during the first eighty-five days, *i.e.*, approximately three months after she brought her brain-damaged baby home.

While we reverse the judgment dismissing the complaint, we observe that the accrual error is attributable more to the parties than to the district court judge. The United States Attorney argued that the cause of action accrued on the date that Valdez was born. This argument relied on a dubious footnote in *Gonzalez v. United States*, 284 F.3d 281 (1st Cir.2002), that did not rise to the level of dictum.[4] Nevertheless, the plaintiffs did not take

issue with it. Instead, their attorney responded that, even so, the complaint was saved by the application of the doctrine of equitable tolling. After argument was joined on this issue, the district court decided it against the plaintiff without undertaking a *sua sponte* analysis of the threshold issue of when the cause of action accrued and the statute of limitations began to run.

■ We address the accrual issue notwithstanding the failure of plaintiffs' counsel to argue it below because, as we have held, "an appellate court has discretion . . . to review of its own motion any error not saved by a timely objection." *Curko v. William Spencer & Son, Corp.*, 294 F.2d 410, 414 (2d Cir.1961); *Cohen v. Franchard Corp.*, 478 F.2d 115, 124 (2d Cir.1973). We do so when necessary to avoid a miscarriage of justice or to remedy "an obvious instance of misapplied law." *Caruolo v. John Crane, Inc.*, 226 F.3d 46, 55 (2d Cir.2000); *see Lambert v. Genesee Hosp.*, 10 F.3d 46, 56 (2d Cir.1993); *see also Cruz v. Melecio*, 204 F.3d 14, 22 n.7 (1st Cir. 2000) ("Notwithstanding that the parties did not raise the issues that impel us to this course either to the district court or on this appeal, we have the power to do so sua sponte.") Thus, when an error involves an erroneous jury instruction to which no objection was taken, we have said that we will reverse if the "plainly erroneous instruction misapplies the law as to a core issue in the case resulting in the

---

4. The Court of Appeals there upheld the dismissal of the complaint on the ground that it was not filed until two years after plaintiff—the mother of a brain-damaged baby—retained an attorney. *Gonzalez*, 284 F.3d at 290–91. In a footnote, the court observed that *"[a]rguably*, we need not apply the discovery rule at all, because the factual basis for the cause of action was not inherently unknowable at the time of the injury, that is, it was not incapable of detection by the plaintiff

through the exercise of reasonable [due] diligence." *Id.* at 290 n. 9 (emphasis added). We here reject, for the same reason Judge Posner rejected a similar argument in *Drazan*, the "arguable" suggestion that "reasonable [due] diligence" required an investigation into the cause of injury on the date the child was born. This suggestion is inconsistent with our understanding of *Kubrick* and the cases applying it.

substantial prejudice of the party challenging the instruction on appeal." *Latsis v. Chandris, Inc.*, 20 F.3d 45, 50 (2d Cir. 1994). The instances in which we have applied such a stringent standard normally involve trial errors, which implicate the significant policy consideration underlying the need for a timely objection, namely, the avoidance of an unnecessary retrial. Because we are satisfied that the test for noticing plain error in these cases has been satisfied here, it is unnecessary for us to decide whether a more forgiving standard would be justified where the procedural default occurred in the context of a pretrial motion that resulted in the erroneous dismissal of the case before trial. At the very least, it is an additional consideration that justifies noticing the error. Indeed, in *Williams v. City of New York*, 508 F.2d 356 (2d Cir.1974) (per curiam), we held that one consideration weighing in favor of noticing a plain error in a jury instruction for punitive damages was "the remediability of [the] error without a new trial below." *Id.* at 362. We simply vacated a punitive damage award that would not have been justified if the jury had been properly instructed. *See id.*

So in this case, we remand so that the district court may develop the record sufficiently to determine the accrual date of plaintiffs' malpractice claim consistent with this opinion. Because on remand the district judge must consider the threshold issue of whether the cause of action accrued within two years of the complaint being filed, we need not now resolve the issue of whether the district court correctly applied the doctrine of equitable tolling, as it related to the issue of when Elon's mother learned that the William F. Ryan Community Health Center was a federally funded health clinic. The accrual determination may render tolling unnecessary. Nevertheless, to the extent equity may remain relevant on remand, some discussion of that issue is necessary.

## II. *Equitable Tolling*

The district judge held that the FTCA limitations period was subject to tolling only if the United States had "fraudulently concealed critical facts that 'prevented plaintiff from becoming aware of, or discovering through the exercise of reasonable diligence, his cause of action.'" *Valdez ex rel. Donely*, 415 F.Supp.2d at 350 (quoting *Kronisch*, 150 F.3d at 123). Because the district judge found no acts of fraudulent concealment precluding plaintiffs' counsel from discovering Dr. Kong's federal employment, the court declined to toll the statute of limitations from the period after Elon's mother had timely retained an attorney—an event that occurred within two years after Elon was born.

We here clarify that fraudulent concealment is not essential to equitable tolling. "The taxonomy of tolling, in the context of avoiding a statute of limitations, includes at least three phrases: equitable tolling, fraudulent concealment of a cause of action, and equitable estoppel." *Pearl v. City of Long Beach*, 296 F.3d 76, 81 (2d Cir.2002) (Newman, *J.*). Equitable tolling permits a plaintiff to avoid the bar of the statute of limitations

> if despite all due diligence he is unable to obtain vital information bearing on the existence of his claim. Equitable tolling is frequently confused both with fraudulent concealment on the one hand and with the discovery rule—governing ... accrual—on the other. It differs from the former in that it does not assume a wrongful—or any—effort by the defendant to prevent the plaintiff from suing.

*Cada*, 920 F.2d at 451 (citation omitted). Because equitable tolling is often confused with fraudulent concealment, cases may be

found holding that equitable tolling applies where the defendants have engaged in such concealment. Nevertheless, we have held explicitly that the application of the doctrine of equitable tolling is not limited to such cases. *See Veltri v. Bldg. Serv. 32B–J Pension Fund,* 393 F.3d 318, 323 (2d Cir.2004) ("The relevant question is not the intention underlying defendants' conduct, but rather whether a reasonable plaintiff in the circumstances would have been aware of the existence of a cause of action." (citing *Pearl v. City of Long Beach,* 296 F.3d 76, 82 (2d Cir.2002) and *Cada,* 920 F.2d at 451)); *see also Canales v. Sullivan,* 936 F.2d 755, 757 (2d Cir.1991) ("[T]his court has rejected the position that equitable tolling is permissible only in misconduct cases.... [G]overnment misconduct is only one example of the circumstances under which equitable tolling is appropriate.").

*Veltri* was an ERISA case in which the plaintiff commenced a cause of action eleven years after the rejection of his claim for benefits—five years beyond the applicable statute of limitations. He claimed that he was not aware of either his right to take an administrative appeal of the initial adverse determination or of his right to file an action challenging that determination in court. *Id.* at 322. While the defendants had provided the plaintiff with a booklet, which may have sufficed to notify him of his right to appeal, they did not comply with a federal regulation requiring that a notice of adverse determination also include "a statement of the claimant's right to bring a civil action." 29 C.F.R. § 2560.503–1(g)(1). We held that the failure of the defendants to comply with this regulation established a special circumstance warranting the doctrine of equitable tolling, even though the failure to provide such notice would not otherwise "normally be held to mandate equitable tolling." *Veltri,* 393 F.3d at 324. Nevertheless, we

also held that a plaintiff, who would otherwise be entitled to rely "on equitable tolling on the basis of defective notice," could forfeit that right if he failed to exercise due diligence to the prejudice of the defendant. *Id.* at 326.

The present case, too, involves a special circumstance that may warrant equitable tolling even absent fraudulent concealment. It arises from the defendant's failure to disclose that physicians, such as Dr. Kong, who provide services in private voluntary hospitals and in what appear to be private clinics, are *de jure* federal employees. Patients receiving such treatment are not aware, because they are never told or put on any notice, that the clinics they attend are government-funded or that doctors treating them are government employees. Such an omission does not rise to the level of fraud. Nevertheless, by not formulating a regulation that would require notice to a patient that the doctor rendering service to him is an employee of the United States, the Department of Health & Human Services has created a potential statute of limitations trap in states, such as New York, which—depending on the circumstances—may provide a longer period of time than the FTCA to file a complaint. The number of cases in which the United States has sought to take advantage of this trap suggests that it is aware of the consequences of its failure to disclose the material facts of federal employment by doctors who might reasonably be viewed as private practitioners. *See, e.g., Motley v. United States,* 295 F.3d 820 (8th Cir.2002); *Gonzalez v. United States,* 284 F.3d 281 (1st Cir.2002); *Gould v. U.S. Dep't of Health & Human Servs.,* 905 F.2d 738 (4th Cir.1990). This conduct, if anything, is more problematic than the nondisclosure that justified invoking the doctrine of equitable tolling in *Veltri.*

To the extent the parties have devoted considerable effort to the import of *Celestine v. Mt. Vernon Neighborhood Health Center,* 403 F.3d 76 (2d Cir.2005), on this appeal, some background is necessary to place the case in context. We observed at the outset of the discussion that, notwithstanding plaintiffs' failure to file an administrative claim before the filing of a complaint against Dr. Kong in New York State Supreme Court, the amended complaint against the United States would not have been time-barred if the initial complaint had been filed within two years of the accrual of the cause of action. While the removed cause of action was subject to dismissal for failure to file an administrative claim, Elon's mother had sixty days after the dismissal of the complaint to file the claim with the Department of Health & Human Services and six months from the denial of her administrative claim to refile the complaint. 28 U.S.C. § 2679(d)(5).

The amendments to the FTCA reflecting this salutary result were adopted in 1988 when Congress passed the Federal Employees Liability Reform & Compensation Act, Pub.L. No. 100–694, 102 Stat. 4563 (1988), otherwise known as the "Westfall Act." A decade before the enactment of the Westfall Act, we had held that the administrative-exhaustion requirement, which must be satisfied before filing an FTCA suit, did not necessarily apply to tort actions initially brought in state court but then removed to federal court. *Kelley v. United States,* 568 F.2d 259, 265–66 (2d Cir.1978).

In *Celestine,* we held that, "[t]o the extent that *Kelley* created a broad exception to the pre-filing exhaustion requirement" it is no longer valid. 403 F.3d at 83. As Judge Calabresi explained:

> The Westfall Act not only clarifies that *all* suits against the United States, in-cluding those originating in state court against defendants yet to be formally replaced by the United States, must be subject to the administrative-exhaustion requirements specified in 28 U.S.C. § 2675, but it also addresses the chief problem that troubled us in *Kelley.* Under the FTCA, as amended by the Westfall Act, a plaintiff like Celestine can file an *administrative* claim within sixty days following the district court's dismissal, and her claim in federal court would be treated—for statute-of-limitations purposes—as if it had been filed on September 3, 2002, the date that the original suit was filed in state court. It would, therefore, seem that the unfairness that motivated *Kelley* was remedied by the Westfall Act.

*Id.* at 83–84 (emphasis in original). Nevertheless, Judge Calabresi cautioned that the Westfall Act "leaves unresolved a corollary problem noted in *Kelley.*" *Id.* at 84. Specifically, the Act provides that a suit will be considered timely had it been brought in federal court on the date it was actually filed in state court. 28 U.S.C. § 2679(d)(5). "If, however, the federal statute of limitations is shorter than the state statute, a plaintiff (reasonably thinking that he has a state law claim) may well bring suit within the state statute-of-limitations window, and yet be outside of the federal one. Such a plaintiff would find himself barred under the Westfall Act." *Celestine,* 403 F.3d at 84.

Under these circumstances, "just as it seemed unfair to the *Kelley* court to apply an administrative-exhaustion requirement to a plaintiff who brought suit in state court (reasonably thinking it to be the proper venue), it is similarly unjust to treat such a timely state suit as federally barred." *Id.* Significantly, for present purposes, Judge Calabresi declared "we cannot say that *Kelley* has been entirely

superseded by the Westfall Act." *Id.* On the contrary,

> [t]o the extent that federal-state disparities in statutes of limitations yield results—akin to the pre-Westfall Act exhaustion prerequisites—in FTCA suits brought originally in state court by plaintiffs who were unaware that the named tortfeasor was acting as an agent of the United States, the reasoning of *Kelley* perdures, and that reasoning may well require equitable tolling in instances where there is a shorter federal statute of limitations, and the difference between these statutes of limitations is determinative of whether the suit can proceed.

*Id.* (footnote omitted).

Plaintiffs urge us to read *Celestine* to suggest that a plaintiff's reasonable belief that he has a state law claim may be sufficient to toll the statute of limitations on a related FTCA action without a showing of fraudulent concealment or due diligence. We need not conclusively decide that question on this appeal. We observe, however, that adherence to the due diligence requirement for equitable tolling would yield a result consistent with the holding in *Drazan* that the statute of limitations does not accrue until the plaintiff knew or should have known that the cause of his injury was related to medical treatment *for which the government was responsible. See Drazan,* 762 F.2d at 59. "Accrual is the date on which the statute of limitations begins to run.... Tolling doctrines stop the statute of limitations from running even if the accrual date has passed." *Cada,* 920 F.2d at 450. As long as due diligence on the part of a plaintiff is required both to delay the accrual of the statute of limitations, as well as to toll its running, the ultimate outcome in this case would not be affected by the theory that saves the complaint. Thus, for present

purposes, we need not stop to disentangle these related concepts as they may apply to plaintiffs' knowledge that Dr. Kong was a federal employee. Nor is it necessary for us to determine at this point whether the efforts made by the attorneys retained by Elon's mother in that regard satisfied the due diligence requirement necessary for her to take advantage of the doctrine of equitable tolling.

## CONCLUSION

The judgment of the district court is VACATED, and the case is REMANDED for further proceedings consistent with this opinion.