PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 19-2434
_____

D.J.S.-W., a minor, by her natural mother
and legal guardian, D'ERICKA STEWART,
Appellant

v.

UNITED STATES OF AMERICA
_____

On Appeal from the United States District Court
for the Western District of Pennsylvania
(D.C. No. 2-17-cv-01335)
Chief District Judge:  Honorable Mark R. Hornak
_____

Submitted Pursuant to Third Circuit L.A.R. 34.1(a)
April 22, 2020

Before:  HARDIMAN, RENDELL and FISHER, *Circuit
Judges*.

(Opinion Filed:  June 22, 2020)

Vincent A. Coppola
Pribanic Pribanic & Archinaco
513 Court Place, First Floor
Pittsburgh, PA 15219
        *Counsel for Appellant*

Scott W. Brady, United States Attorney
Haley F. Warden-Rodgers
Laura S. Irwin
Office of United States Attorney
700 Grant Street, Suite 4000
Pittsburgh, PA 15219
        *Counsel for Appellee*

_____

OPINION OF THE COURT

_____

FISHER, *Circuit Judge*.

D.J.S.-W., a young girl who sustained a shoulder injury during birth, argues that the limitations period for filing her medical malpractice claim under the Federal Tort Claims Act (FTCA), 28 U.S.C. §§ 1346(b), 2671–80, should be equitably tolled. Because D.J.S.-W. fails to show both that she diligently pursued her rights and that extraordinary circumstances prevented her from timely filing, we decline to accord her such an exceptional remedy. Accordingly, we will affirm the District Court's grant of summary judgment to the United States.

**I.**

In late 2009, D.J.S.-W. was born at Sharon Regional Health Center (Sharon Hospital) in Mercer County,

2

Pennsylvania, under the care of John Gallagher, M.D. During delivery, D.J.S.-W. sustained a brachial plexus injury, which allegedly caused permanent damage to her right shoulder and arm.

In the next few months, D.J.S.-W.'s mother retained counsel to pursue D.J.S.-W.'s potential malpractice claims against Sharon Hospital and Dr. Gallagher. In 2010 and 2011, in preparing to file D.J.S.-W.'s case, counsel requested medical and billing records from Sharon Hospital on three occasions. During this time, counsel also sent one request for medical records directly to Dr. Gallagher. All four requests were limited temporally "to those records pertinent to the time when Dr. Gallagher's alleged negligence occurred—the delivery of [D.J.S.-W.] . . . and the 12 hours prior to the delivery, the time at which [D.J.S.-W.'s mother] presented to Sharon . . . Hospital to give birth." App. 204 ¶ 12. Beyond these record requests, counsel also visited Sharon Hospital's website, which listed Dr. Gallagher as an Obstetrics & Gynecology doctor, and conducted a Google search of both Sharon Hospital and Dr. Gallagher.

D.J.S.-W.'s counsel believed that Dr. Gallagher was privately employed because Dr. Gallagher delivered D.J.S.-W. at Sharon Hospital—an entity against which counsel had previously litigated and knew to be private—and was listed on the Sharon Hospital website. Despite his investigatory efforts in preparing to file her case, D.J.S.-W.'s counsel did not discover that at the time of D.J.S.-W.'s birth, Dr. Gallagher was employed by Primary Health Network, a "deemed" federal entity eligible for FTCA malpractice coverage. Under federal law, entities that receive federal funding to serve medically underserved populations, as well as "health practitioners that such entities employ[,] 'shall be deemed to be [employees] of the Public Health Service.'" *Lomando v. United States*, 667

F.3d 363, 371 (3d Cir. 2011) (second alteration in original) (quoting 42 U.S.C. § 233(g)(1)(A)). This status "is highly significant" because "an action against the United States under the FTCA is the exclusive remedy for persons alleging 'personal injury . . . resulting from the performance of medical . . . functions' by Public Health Service employees acting within the scope of their employment." *Id.* (quoting 42 U.S.C. § 233(a)). Indeed, D.J.S.-W.'s counsel had litigated a prior case in which the United States substituted itself for a defendant doctor because he was a "deemed" federal employee.

During the preparation of D.J.S.-W.'s case, counsel did not visit or call Sharon Hospital, Dr. Gallagher, or any Primary Health Network office. He did not search the Health Resources and Services Administration database, which would have revealed that Primary Health Network was a "deemed" federal entity (although, at the time, it did not list individual providers like Dr. Gallagher). Nor did counsel visit Primary Health Network's website or search Primary Health Network on Google. At the time, its website and each of its offices indicated that Primary Health Network was a "Federally Qualified Health Center."

Furthermore, counsel never requested medical records from Primary Health Network, nor did he ask for records from any healthcare provider or facility that identified a responsive date range earlier than D.J.S.-W.'s birth in November 2009. Records from before D.J.S.-W.'s birth, however, show that at the time of her birth, her mother had been a patient of Dr. Gallagher's for over ten years and had visited the Primary Health Network office in Sharon, Pennsylvania. Of the medical records counsel did ask for, he sent one request directly to "John Gallagher, M.D., One Dayton Way, Suite 6, Sharon, PA 16146"—the street address of a Primary Health Network office. App. 236. And of the records Dr. Gallagher sent in

4

response to counsel's request, two pages included the words "Primary Health Network" at the bottom of the page immediately above Dr. Gallagher's name and mailing address. *D.J.S.-W. v. United States*, No. 2:17-cv-01335, 2019 WL 1894707, at \*3, \*11 (W.D. Pa. Apr. 29, 2019).

In late 2016—nearly seven years after the allegedly negligent delivery—D.J.S.-W.'s mother filed suit on D.J.S.-W.'s behalf against Dr. Gallagher and Sharon Hospital in Pennsylvania state court. Despite Pennsylvania's two-year limitation for bringing personal injury actions, *see* 42 Pa. Cons. Stat. § 5524(2), D.J.S.-W.'s counsel, "[a]cting according to his custom and practice," deliberately delayed filing D.J.S.-W.'s case "in anticipation of acquiring additional knowledge regarding the severity and permanency of [her] injuries," App. 211 ¶ 72. In doing so, counsel relied on a Pennsylvania statute, 42 Pa. Cons. Stat. § 5533(b)(1), which tolls a minor plaintiff's action until she turns eighteen.

Soon after the case was filed, the Government removed it to the U.S. District Court for the Western District of Pennsylvania and moved to substitute the United States for Dr. Gallagher because he was working within the scope of his federal employment with Primary Health Network at the time of the allegedly negligent delivery. The District Court granted the motion for substitution, at which point the United States moved to dismiss on the basis that D.J.S.-W. failed to timely exhaust her administrative remedies as required under the FTCA. The District Court then dismissed the case against the United States without prejudice and remanded the case against Sharon Hospital for lack of subject-matter jurisdiction.[1]

---

[1] The case against Sharon Hospital was still pending in state court when the parties briefed this appeal.

5

After exhausting administrative remedies,[2] D.J.S.-W.'s counsel filed anew D.J.S.-W.'s claim against the United States in the District Court. The United States moved to dismiss, arguing that her action was untimely under the FTCA. The District Court denied the motion, ordering the parties to engage in limited discovery regarding the FTCA's statute of limitations and equitable tolling.

At the close of discovery, the United States moved for summary judgment, again arguing that D.J.S.-W.'s suit was untimely. Although conceding that she did not timely file, D.J.S.-W. argued that she was entitled to equitable tolling of the FTCA's limitations period because she—or more accurately, her counsel—"had no reason to know that [Dr. Gallagher] was a 'deemed' federal employee or that further inquiry into his status was required." Supp. App. 26. The District Court disagreed, holding that D.J.S.-W. failed to "meet her burden to obtain the extraordinary remedy of equitable tolling." *D.J.S.-W.*, 2019 WL 1894707, at *10. Accordingly, the Court granted the Government's motion for summary judgment because D.J.S.-W.'s "negligence claim against the United States is . . . barred as untimely." *Id.* D.J.S.-W. appeals.

**II.**[3]

"As a sovereign, the United States is immune from suit unless it consents to be sued." *Sconiers v. United States*, 896

---

[2] D.J.S.-W. presented her claims to the U.S. Department of Health and Human Services. Her administrative claim was deemed denied when the agency failed to act within six months. *See* 28 U.S.C. § 2675(a).

[3] The District Court had jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1346(b)(1), and we have jurisdiction under 28 U.S.C. § 1291. "Our review of the District Court's [summary

F.3d 595, 597 (3d Cir. 2018) (quoting *White-Squire v. U.S. Postal Serv.*, 592 F.3d 453, 456 (3d Cir. 2010)). The FTCA represents "a limited waiver of th[at] sovereign immunity," *Santos ex rel. Beato v. United States*, 559 F.3d 189, 193 (3d Cir. 2009), providing that "[t]he United States shall be liable, respecting . . . [certain] tort claims, in the same manner and to the same extent as a private individual under like circumstances," 28 U.S.C. § 2674.

Bringing a claim under the FTCA requires following various procedural requirements. The FTCA dictates that "a tort claim against the United States 'shall be forever barred' unless it is presented to the 'appropriate Federal agency within two years after [it] accrues' and then brought to federal court 'within six months' after the agency acts on the claim." *United States v. Wong*, 575 U.S. 402, 405 (2015) (quoting 28 U.S.C. § 2401(b)). If the agency fails to act within six months, the claimant may proceed to file her case in district court. 28 U.S.C. § 2675(a).

Here, both parties agree that D.J.S.-W.'s case—which was first filed in state court almost seven years after her birth, the date on which her claim accrued—was not timely presented to the appropriate agency in accordance with these requirements. And although D.J.S.-W.'s counsel deliberately delayed filing her case in reliance on Pennsylvania's tolling statute, that law cannot save D.J.S.-W.'s untimely claim against the United States because "state-law tolling statutes do

judgment] decision is plenary." *State Auto Prop. & Cas. Ins. v. Pro Design, P.C.*, 566 F.3d 86, 89 (3d Cir. 2009). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

not apply to the FTCA's limitations period." *Santos*, 559 F.3d at 193. Thus, the sole issue on appeal is whether D.J.S.-W. has shown that she is entitled to the extraordinary remedy of equitable tolling of the FTCA's limitations period.[4] We first clarify the test that a litigant seeking equitable tolling must satisfy. We then explain why D.J.S.-W. fails to meet that standard in this case.

## A. Our Equitable-Tolling Test

It is well established that a court may "rescue a claim otherwise barred as untimely by a statute of limitations when a plaintiff [shows she] has 'been prevented from filing in a timely manner due to sufficiently inequitable circumstances.'" *Id.* at 197 (quoting *Seitzinger v. Reading Hosp. & Med. Ctr.*, 165 F.3d 236, 240 (3d Cir. 1999)). Tolling "is [an] extraordinary" remedy, *id.*, and "is proper only when the 'principles of equity would make [the] rigid application [of a limitation period] unfair," *Miller v. N.J. State Dep't of Corr.*, 145 F.3d 616, 618 (3d Cir. 1998) (alterations in original) (quoting *Shendock v. Dir., Office of Workers' Comp. Programs*, 893 F.2d 1458, 1462 (3d Cir. 1990) (en banc)). "It is especially appropriate to be restrictive" in extending this remedy "in cases involving the waiver of the sovereign immunity of the United States," such as those arising under the FTCA. *Santos*, 559 F.3d at 197–98.

Our Court uses the term "equitable tolling" broadly to encompass several situations under which a statute of limitations period may be tolled on equitable grounds. We have said that:

---

[4] "The time limits in the FTCA are just time limits," not jurisdictional requirements, and, therefore, "a court can toll them on equitable grounds." *Wong*, 575 U.S. at 412.

8

[T]here are three principal, though not exclusive, situations in which equitable tolling may be appropriate: (1) where the defendant has actively misled the plaintiff respecting the plaintiff's cause of action; (2) where the plaintiff in some extraordinary way has been prevented from asserting . . . her rights; or (3) where the plaintiff has timely asserted . . . her rights mistakenly in the wrong forum.[5]

*Oshiver v. Levin, Fishbein, Sedran & Berman*, 38 F.3d 1380, 1387 (3d Cir. 1994), *abrogated on other grounds by Rotkiske v. Klemm*, 890 F.3d 422, 428 (3d Cir. 2018) (en banc), *aff'd* 140 S. Ct. 355 (2019). In addition, a litigant "will not receive the benefit of" tolling in any of these situations "unless she

---

[5] Our Court often refers to all three of these situations "as falling under the overarching heading of 'equitable tolling'" because each "tolls a limitations period on equitable grounds." *Edmonson v. Eagle Nat'l Bank*, 922 F.3d 535, 550 (4th Cir. 2019) (describing the Third Circuit's approach). Other circuits use the phrase to refer only to the second situation in our list— that is, "when a plaintiff's failure to timely file suit is *not* attributable [to] wrongful conduct by the defendant." *Id.*; *see also Zappone v. United States*, 870 F.3d 551, 556 (6th Cir. 2017); *Valdez ex rel. Donely v. United States*, 518 F.3d 173, 183 (2d Cir. 2008); *Cada v. Baxter Healthcare Corp.*, 920 F.2d 446, 451 (7th Cir. 1990). In recent years, the Supreme Court has also used the phrase "equitable tolling" in this more specific sense. *See Holland v. Florida*, 560 U.S. 631, 644–45 (2010). As we explain above, only the second of our three tolling scenarios is at issue here, so we need not (and do not) resolve the difference in terminology.

exercised due diligence in pursuing and preserving her claim." *Santos*, 559 F.3d at 197. That is, tolling will never extend to "a garden variety claim of excusable neglect, such as a simple miscalculation that leads a lawyer to miss a filing deadline." *Holland*, 560 U.S. at 651–52 (internal quotation marks and citations omitted).

The second tolling situation is at issue here—D.J.S.-W. argues that she encountered extraordinary circumstances that prevented her from timely filing.[6] Thus, to be entitled to equitable tolling, D.J.S.-W. must show that she "in some extraordinary way has been prevented from asserting . . . her rights," and that she "exercised due diligence in pursuing and preserving her claim." *See Santos*, 559 F.3d at 197 (internal quotation marks omitted). This is the same test that the Supreme Court uses to assess whether a petitioner may be entitled to equitable tolling in the habeas context. *See Holland*, 560 U.S. at 649 ("[A] 'petitioner' is 'entitled to equitable tolling' only if he shows '(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way' and prevented timely filing." (quoting *Pace v. DiGuglielmo*, 544 U.S. 408, 418 (2005))). In *Menominee Indian Tribe of Wisconsin v. United States*, the Supreme Court applied the same test to assess a Tribe's claim that equitable

---

[6] D.J.S.-W. does not explicitly state that her claim falls under the second tolling situation in our list. But her argument relies heavily on *Santos*, which involved the second tolling doctrine. *See* 559 F.3d at 203. Furthermore, neither of the other two bases applies—D.J.S.-W. does not argue that she was actively misled, and all parties agree that she did not timely assert her claim in state court. Nor does D.J.S.-W. argue that any other tolling doctrine should apply.

10

tolling should excuse its failure to timely present a contract dispute to a federal contracting officer. 136 S. Ct. 750, 754–56 (2016). In doing so, the Court noted that it has "never held that [*Holland*'s] equitable-tolling test necessarily applies outside the habeas context" and, therefore, it has not yet "decide[d] whether an even stricter" or "a more generous test" may apply to nonhabeas cases. *Id.* at 756 n.2.[7]

Nevertheless, because the *Holland* test is the same as our test for assessing equitable tolling in the nonhabeas context, *Menominee* is instructive. In particular, the Court made two observations that help us more clearly define the contours of our test.

First, it stated that the two requirements—extraordinary circumstances and diligence—are "distinct elements," both of which must be satisfied for a litigant to be eligible for tolling. *Id.* at 756. Treating the two requirements as separate prongs, the Court said, was consistent with its prior language describing the components as "elements," *id.* (citing *Pace*, 544 U.S. at 418), and its practice of denying "requests for equitable tolling where a litigant failed to satisfy one without addressing whether he satisfied the other," *id.* (citing *Lawrence v. Florida*, 549 U.S. 327, 336–37 (2007), and *Pace*, 544 U.S. at 418).

We agree with this characterization of the equitable-tolling test. Although our prior case law may appear to have blended the two components, this is merely a reflection of the fact that, in practice, the two elements often go hand in hand. For example, if no extraordinary circumstances stood in the

---

[7] In recent years, the Court has also referenced the *Holland* equitable-tolling test in other nonhabeas cases. *See, e.g.*, *Wong*, 575 U.S. at 407–08; *Lozano v. Montoya Alvarez*, 572 U.S. 1, 10 (2014).

litigant's way, but she nevertheless failed to timely file, it is likely that she did not diligently investigate and pursue her claim. *See, e.g.*, *id.* at 756–57 (declining to equitably toll limitations period because Tribe's failure to timely present its claims was caused "not by an obstacle outside its control, but by [its] mistaken belief that presentment was unneeded"); *Hedges v. United States*, 404 F.3d 744, 752–54 (3d Cir. 2005) (declining to equitably toll limitations period because plaintiff's pro se status and mental incompetence were not extraordinary circumstances and "[d]iligent research would likely have revealed . . . the existence" of his claim). Similarly, if, despite pursuing her claim diligently, a litigant was still unable to timely file, it is likely that some extraordinary circumstance stood in her way and prevented her from doing so. *See Santos*, 559 F.3d at 198–203 (holding plaintiff entitled to equitable tolling when she "diligently and vigorously pursued her claim" and, yet, she was unable to ascertain hospital's federal status). Today, we follow *Menominee*'s guidance and confirm that the two requirements are distinct prongs, both of which a litigant must satisfy before equitable tolling may apply.

Second, the Supreme Court also "reaffirm[ed]" that the extraordinary-circumstances element "is met only where the circumstances that caused a litigant's delay are both extraordinary *and* beyond [her] control." *Menominee*, 136 S. Ct. at 756. We agree with this description of the extraordinary-circumstances prong. Indeed, because equitable tolling is an extreme remedy that we extend "only sparingly," *Irwin v. Dep't of Veterans Affairs*, 498 U.S. 89, 96 (1990), it "would make little sense if [it] were available when a litigant was responsible for [her] *own* delay," *Menominee*, 136 S. Ct. at 756. In addition, because the extraordinary-circumstances and diligence components are distinct elements, "the diligence

12

prong already covers those affairs within the litigant's control" and the "extraordinary-circumstances prong, by contrast, is meant to cover matters outside [her] control." *Menominee*, 136 S. Ct. at 756. Accordingly, we also clarify today, following the Supreme Court's guidance, that a litigant will only meet the extraordinary-circumstances prong of our test for equitable tolling when she shows that her delay was attributable to circumstances that were "both extraordinary *and* beyond [her] control." *Id.*

In sum, for a litigant to be entitled to equitable tolling, she must establish two elements: "(1) that [s]he has been pursuing her rights diligently, and (2) that some extraordinary circumstance stood in h[er] way and prevented timely filing." *Id.* at 755; *see also Santos*, 559 F.3d at 197. The two components are distinct elements, both of which the litigant must satisfy. And to meet the extraordinary-circumstances element, the litigant must show that the circumstances were "extraordinary *and* beyond [her] control." *Menominee*, 136 S. Ct. at 756.

## B. D.J.S.-W. Fails to Meet Our Equitable-Tolling Standard

Here, D.J.S.-W. fails to satisfy either prong of this test. She did not diligently pursue her rights because she failed to take reasonable steps to confirm Dr. Gallagher's employment status. Nor did any circumstances, both extraordinary and outside her control, stand in her way and prevent her "from discovering Dr. Gallagher's true affiliations." *D.J.S.-W.*, 2019 WL 1894707, at *9 (citing *Menominee*,136 S. Ct. at 755).

D.J.S.-W. emphasizes our decision in *Santos*, in which we tolled the FTCA's limitations period to rescue Santos's untimely claim because the government had created a trap that prevented her from learning, despite her counsel's diligent

13

investigation, that her alleged tortfeasors were federally employed. 559 F.3d at 204. *Santos* is similar to this case: a minor filed medical malpractice claims in state court against a healthcare facility, known as York Health, and several of its employees. *Id.* at 190–91. Her counsel filed her suit after the two-year limitations period had run in reliance on Pennsylvania's tolling statute. *Id.* at 191. As it turned out, however, York Health was a "deemed" federal entity. *Id.* at 191–92. After the government substituted the United States as defendant and moved for summary judgment, Santos argued that the FTCA's limitations period should be equitably tolled. *Id.* at 192.

We agreed with Santos and reversed the district court's grant of summary judgment to the United States. *Id.* at 204. Santos, we said, diligently pursued her claim: she hired counsel, "who requested and reviewed her medical records, [and] visited, corresponded with, and performed a public records search on York Health." *Id.* at 198. Yet, "[n]one of these inquiries, records, visits, or correspondence gave him a clue that the healthcare providers or York Health had been deemed federal employees." *Id.* at 200–01. York Health's federal status, we concluded, "if not covert, was at least oblique." *Id.* at 202. Although York Health's website indicated that it received funds from federal sources and that it was a "federally-qualified health center," there were no "publicly available sources of information from which Santos could have learned" that York Health was in fact a federal entity. *Id.* at 201–03. Moreover, "even if the information had been available," there were no circumstances that "should have led [Santos's counsel] to inquire into York Health's federal status" in the first place. *Id.* at 203. Thus, we held that "the equitable

14

tolling doctrine applie[d] . . . to toll the FTCA's statute of limitations." *Id.* at 204.[8]

Despite D.J.S.-W.'s arguments to the contrary, even a cursory read of *Santos* reveals that Santos's counsel went to far greater lengths to confirm her alleged tortfeasors' employment status than D.J.S.-W.'s counsel did here. While counsel in *Santos* performed a public records search on, corresponded with, and visited York Health as part of his investigation, D.J.S.-W.'s counsel merely assumed that Dr. Gallagher was employed by Sharon Hospital—which he knew to be a private entity—because D.J.S.-W. was born there and Dr. Gallagher was listed as a "team member" on its website. But, as D.J.S.-W.'s counsel admits, he never corresponded with, called, or visited Sharon Hospital or Dr. Gallagher to confirm this belief.

---

[8] The Government argues that "*Menominee* may undermine the holding in *Santos*" because "Santos's counsel's erroneous belief that York Health was a private entity . . . was neither extraordinary nor 'an obstacle beyond [his] control.'" Appellee's Br. 25–26 (quoting *Menominee*, 136 S. Ct. at 756 & n.3). We disagree. In *Santos*, we concluded that the government had created a "trap" for litigants like Santos because there were no "publicly available sources of information from which Santos could have" discovered York Health's federal status, nor were there any circumstances that should have "led her to inquire into York Health's federal status." 559 F.3d at 203. Despite diligent research, the opacity of York Health's federal status was an extraordinary circumstance that stood in Santos's way and prevented her from timely filing. Thus, our holding in *Santos* would not change under the clarified test we discuss today.

15

D.J.S.-W. argues that her counsel's efforts were diligent because there was no "trigger" that would have prompted him to examine Dr. Gallagher's true employer, Primary Health Network. Appellant's Br. 15. This is not so. There were numerous red flags that would have caused a diligent plaintiff or her counsel to investigate Dr. Gallagher's employment status. As the District Court observed, "[i]t ordinarily should not come as a surprise to a medical malpractice lawyer . . . that an obstetric physician's relationship to a hospital may simply be" that he has "admitting privileges to deliver his patients' babies." *D.J.S.-W.*, 2019 WL 1894707, at *9 (internal footnote omitted). Given that such an arrangement is not uncommon, it seems strange that counsel did not either ask D.J.S.-W.'s mother "where she normally saw Dr. Gallagher for her pre-natal care" or expand the temporal scope of his record request to ensure Dr. Gallagher had not treated her at another facility. *Id.*

There were also other triggers that should have prompted counsel to investigate Dr. Gallagher's employment status. For example, counsel's own law office sent record requests to Sharon Hospital and Dr. Gallagher at different addresses. Indeed, had counsel visited or searched the address to which his office sent the request to Dr. Gallagher, he would have discovered that it was a street address for Primary Health Network. In addition, two of the pages of records sent by Dr. Gallagher in response to that request contained the phrase "Primary Health Network" at the bottom of the page above Dr. Gallagher's name and address. *See id.* at *3, *11. Finally, D.J.S.-W.'s counsel should have been on heightened alert given his own personal experience in litigating a malpractice case involving the substitution of the United States for a defendant physician because he was an employee of a "deemed" federal entity.

16

Had counsel taken the reasonable step of investigating these red flags, he could have easily discovered that Dr. Gallagher was employed by Primary Health Network. Had counsel then investigated Primary Health Network, he could have discovered that it was a "deemed" federal entity. Indeed, unlike counsel in *Santos*, who corresponded with, performed a public search on, and visited York Health, D.J.S.-W.'s counsel did not take any of these steps. Had he visited a Primary Health Network office or searched its website, he would have seen that Primary Health Network "held itself out as a 'federally qualified health center' via," *inter alia*, "physical signs in its waiting rooms . . . and notices on its website." *Id.* at *9. If, like in *Santos*, these statements were insufficient to alert counsel to Primary Health Network's "deemed" federal status, *see Santos*, 559 F.3d at 201–02, he could have double checked by searching Primary Health Network in the Health Resources and Services Administration database.

In sum, D.J.S.-W. did not exercise due diligence to meet our equitable-tolling standard. Rather, her effort here—or, more accurately, her counsel's effort—was, at most, a "garden variety claim of excusable neglect," *see Irwin*, 498 U.S. at 96, to which "[t]he principles of equitable tolling . . . do not extend," *Santos*, 559 F.3d at 197.

Because a plaintiff must meet both prongs of the equitable-tolling test, we could conclude our discussion here, having determined that D.J.S.-W. did not diligently pursue her claim. *See Menominee*, 136 S. Ct. at 757 n.5. We briefly note, however, that D.J.S.-W. also fails to demonstrate that any extraordinary circumstances "stood in h[er] way and prevented timely filing." *Id.* at 755 (quoting *Holland*, 560 U.S. at 649). The plaintiff in *Santos* encountered extraordinary circumstances because the government had created "a potential statute of limitations trap" that prevented her from discovering

17

the defendant's federal status. 559 F.3d at 202 (quoting *Valdez*, 518 F.3d at 183). The government itself ensured that "York Health's federal status, if not covert, was at least oblique," and there were no "publicly available sources of information from which Santos could have learned this critical fact," nor were there any "circumstances [that] should have led her to inquire into York Health's federal status." *Id.* at 203.

According to D.J.S.-W., the circumstances in her case were similarly extraordinary. She argues that Dr. Gallagher created a trap, like that in *Santos*, because he knew that his biography on Sharon Hospital's website "created the illusion" that he was employed by "that private hospital," which could, in turn, "relax the guard of even the most diligent person." Appellant's Br. 14. There was, however, no trap here, and Dr. Gallagher's employment with Primary Health Network was far from "oblique." As discussed above, had counsel discussed the issue with his client, expanded the temporal scope of his record requests, called Sharon Hospital or Dr. Gallagher, or investigated the address to which he sent one of his record requests and which appeared on some of the records he received, he would have discovered Dr. Gallagher's true employer. As the District Court stated, "[t]he real trap that . . . [c]ounsel fell into was the assumption that a doctor who has a biographical page on a private healthcare facility's website . . . cannot be employed by another facility or entity." *D.J.S.-W.*, 2019 WL 1894707, at *8. This miscalculation was certainly not "beyond [counsel's] control," and, thus, no extraordinary circumstances stood in D.J.S.-W.'s way to prevent her from timely filing her claim.[9] *See Menominee*, 136 S. Ct. at 756.

---

[9] D.J.S.-W. argues that Dr. Gallagher "bore responsibility to make sure that his status was *unambiguous* to his patients." Appellant's Br. 14. Accordingly, she asks us to announce a rule

## III.

Because we conclude that equitable tolling does not save D.J.S.-W.'s untimely claim, we will affirm the District Court's order granting summary judgment in favor of the United States.

---

that doctors like Dr. Gallagher who generally treat patients at private hospitals, "may not insulate [themselves] against application of equitable tolling" unless they notify "the patient in some reasonably direct manner of the federal affiliation." Appellant's Br. 15. But it is D.J.S.-W. who bore the burden to timely assert her rights or to show that, despite her diligent investigation, she was prevented from doing so by extraordinary circumstances. D.J.S.-W. offers no legal basis for imposing an affirmative reporting requirement on healthcare providers like Dr. Gallagher. *See, e.g.*, *Arteaga v. United States*, 711 F.3d 828, 834 (7th Cir. 2013) ("No physician, clinic, hospital, or other medical provider is required to provide patients with detailed instructions on how to sue the provider for malpractice."); *Hedges*, 404 F.3d at 752 (rejecting argument that "the Government has an affirmative duty to inform litigants, including *pro se* litigants, that they have viable judicial . . . remedies").