10-2086-cv
A.Q.C. v. United States

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

———————

August Term, 2010

(Argued: June 6, 2011    Decided: September 8, 2011)

Docket No. 10-2086-cv

———————

A.Q.C., an infant, by her mother and natural guardian, PAQUITA CASTILLO,

*Plaintiff-Appellant*,

— v. —

UNITED STATES,

*Defendant-Appellee*,

BRONX-LEBANON HOSPITAL CENTER,

*Defendant.*[*]

———————

B e f o r e:

NEWMAN, MINER, and LYNCH, *Circuit Judges*.

———————

[*] The Clerk of Court is respectfully directed to amend the official caption in this case to conform to the listing of the parties above.

Plaintiff-appellant A.Q.C., by her mother and natural guardian Paquita Castillo, appeals from a May 20, 2010, judgment of the United States District Court for the Southern District of New York (Naomi Reice Buchwald, *J.*) dismissing her medical malpractice claim. Because A.Q.C. failed to comply with the two-year limitations period set out in 28 U.S.C. § 2401(b), and because equitable tolling, even if available, is unwarranted, we affirm the judgment.

AFFIRMED.

MITCHELL L. GITTIN (John E. Fitzgerald, John M. Daly, John J. Leen, *on the brief*), Fitzgerald & Fitzgerald, P.C., Yonkers, NY, *for Plaintiff-Appellant*.

AMY A. BARCELO, Assistant United States Attorney (Sarah S. Normand, Assistant United States Attorney, *on the brief*), *for* Preet Bharara, United States Attorney for the Southern District of New York, New York, NY, *for Defendant-Appellee*.

GERARD E. LYNCH, *Circuit Judge*:

Plaintiff-appellant A.Q.C., by her mother and natural guardian Paquita Castillo, brought this medical malpractice action under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346, 2401, 2671-2680. The merits of that claim are not before us; instead, we must determine whether it is "forever barred" by the FTCA's two-year limitations period. See 28 U.S.C. § 2401(b).

We find that A.Q.C.'s claim accrued no later than February 2006, when Ms.

Castillo consulted an attorney, diligently acting on information received in December 2005, when an early intervention counselor informed her that the injury A.Q.C. sustained at birth might have been iatrogenic (that is, caused by her doctor) and told Ms. Castillo that she should consider consulting an attorney. The law firm she selected, unfortunately, did not share her diligence. Rather than presenting A.Q.C.'s claim to the Department of Health and Human Services ("DHHS") within two years of either Ms. Castillo's December 2005 conversation with the early intervention counselor or the initial consultation in February 2006, the firm waited until April 7, 2008. That delay made the filing untimely by between two and four months. Moreover, the firm's dilatory response prevents equitable tolling – assuming arguendo that such tolling may be applied in medical malpractice actions brought under the FTCA – from saving A.Q.C.'s otherwise untimely complaint. We therefore affirm the judgment of the district court (Naomi R. Buchwald, *J.*) dismissing the complaint as untimely.

**BACKGROUND**

Dr. Wilfred A. Castillo served as Ms. Castillo's regular obstetrician at a prenatal clinic run by Urban Health Plan, Inc. ("UHP"), a federally funded healthcare provider serving the South Bronx.[1] When it came time for Ms. Castillo to give birth, Dr. Castillo suggested that she do so at Bronx-Lebanon Hospital Center, and Ms. Castillo agreed. On February 1, 2005, Dr. Castillo delivered A.Q.C.

---

[1] Nothing in the record suggests that Ms. Castillo and Dr. Castillo are related.

According to the amended complaint, A.Q.C. was born with weakness in her left arm and left leg. In part because of that debility, she was referred to an early intervention counselor who monitored her ongoing care. Ms. Castillo met with A.Q.C.'s counselor in December 2005. After reviewing some of A.Q.C.'s medical records, the counselor raised the possibility that A.Q.C.'s injury had been caused by medical malpractice and told Ms. Castillo that she "should consider looking into whether or not there was any medical malpractice relating to [her] daughter's birth."

Shortly thereafter, Ms. Castillo saw a television advertisement for Fitzgerald & Fitzgerald, P.C. ("Fitzgerald & Fitzgerald" or "the Firm"). According to Ms. Castillo, that advertisement "discussed children with the same type of injuries [as A.Q.C., and indicated] that such injuries might [be] caused by medical malpractice during the birthing process." Ms. Castillo contacted the Firm in February 2006 and discussed with a paralegal the nature and potential cause of her daughter's injury. That consultation led to a retainer agreement, which the parties signed on April 27, 2006. According to the Firm, by August of that year it had "determined that [A.Q.C.'s] injuries were caused by medical malpractice during . . . labor and delivery." Nevertheless, it did not present A.Q.C.'s claim to DHHS at that time.

On November 24, 2006, Ms. Castillo's attorneys met and discussed her case, but still no action was taken. At a second meeting held in March 2007, the Firm initiated "a full review of the medical records." After concluding that review, the Firm held a third

4

meeting in early December 2007, at which it was decided that the appropriate next step was to file suit.

Although the Firm decided to bring this action, it evidently had not investigated whom or where to sue. More precisely, the Firm appears not to have known that UHP was a federally funded clinic or that Dr. Castillo was acting as a federal employee during the delivery. See 42 U.S.C. § 233(g)(1)(A). It was therefore unaware that the United States was legally responsible for the care that Dr. Castillo provided, see id. § 233(g)-(n), or that A.Q.C.'s medical malpractice claim had to be preceded by the filing of an administrative claim with DHHS, see 28 U.S.C. § 2401(b).

The Firm belatedly realized this important fact almost by accident. On or just before February 25, 2008, Fitzgerald & Fitzgerald attorney Ann Chase learned from a colleague that a doctor in an unrelated case had been deemed a federal employee. This prompted Chase to inquire into Dr. Castillo's status. She placed a toll-free call to a government hotline (1-866-FTCA-HELP) established for the very purpose of facilitating such inquiries and discovered that UHP was covered by the FTCA. She therefore correctly "presumed that Dr. Castillo might be deemed a federal employee." Approximately one month later, on April 7, 2008, the Firm presented A.Q.C.'s claim to DHHS. A contemporaneous memorandum circulated among A.Q.C.'s attorneys reveals that the Firm recognized the untimeliness of that claim form and intended "to ask for permission to file beyond two years."

5

During the pendency of A.Q.C.'s administrative claim, the Firm filed a summons and complaint in state court against Dr. Castillo and Bronx-Lebanon Hospital Center. On November 2, 2009, the government removed the case to the United States District Court for the Southern District of New York, substituted itself for Dr. Castillo, see 28 U.S.C. § 2679(d)(1), and moved to dismiss the complaint, alleging that A.Q.C. had failed to file her administrative claim within the applicable two-year limitations period, id. § 2401(b).

The district court found that A.Q.C.'s claim accrued in December 2005 when the early intervention counselor encouraged Ms. Castillo to seek legal advice. A.Q.C. ex rel. Castillo v. United States, 715 F. Supp. 2d 453, 458 (S.D.N.Y. 2010). It therefore determined that A.Q.C.'s claim, having accrued more than two years before its April 7, 2008, presentation to DHHS, was untimely. Id. at 464. The district court went on to reject the application of equitable tolling and ultimately granted the government's motion to dismiss. Id. This appeal followed.

**DISCUSSION**

I. Date of Accrual

On appeal, A.Q.C. argues that the district court erred in finding that her claim accrued at the time of Ms. Castillo's conversation with the early intervention counselor. According to A.Q.C., Ms. Castillo "could not have reasonably believed that her daughter's injuries . . . were iatrogenic until her own medical records and her daughter's had been analyzed by experts." She therefore submits that her claim did not accrue "until

6

July 27, 2006," once "Fitzgerald & Fitzgerald received [her] medical records."

Alternatively, A.Q.C. submits that her claim accrued no earlier than April 27, 2006, the date on which Ms. Castillo retained counsel. We disagree.

Federal law determines the date that an FTCA claim accrues. Syms v. Olin Corp., 408 F.3d 95, 107 (2d Cir. 2005); accord Tyminski v. United States, 481 F.2d 257, 262-63 (3d Cir. 1973) (collecting cases). Typically, FTCA medical malpractice claims accrue "at the time of injury." Kronisch v. United States, 150 F.3d 112, 121 (2d Cir. 1998); see also Barrett v United States, 689 F.2d 324, 327 (2d Cir. 1982) ("It has generally been held that under the FTCA a tort claim accrues at the time of the plaintiff's injury.").[1] However, where a plaintiff "would reasonably have had difficulty discerning the fact or cause of injury at the time it was inflicted, the so-called 'diligence-discovery rule of accrual' applies." Kronisch, 150 F.3d at 121; see also Valdez ex rel. Donely v. United States, 518 F.3d 173, 177 (2d Cir. 2008).

---

[1] Dicta in one of our previous opinions described FTCA claims as accruing when the "plaintiff *discovers* that he has been injured." Valdez ex rel. Donely v. United States, 518 F.3d 173, 177 (2d Cir. 2008) (emphasis added), citing Kronisch, 150 F.3d at 121. That language conflicts with the clear law of this Circuit, see, e.g., Johnson v. Smithsonian Inst., 189 F.3d 180, 189 (2d Cir. 1999), "the general rule" that FTCA claims "accrue[] at the time of the plaintiff's injury," United States v. Kubrick, 444 U.S. 111, 120 (1979), and even the very case upon which Valdez relied for that proposition, see Kronisch, 150 F.3d at 121 (stating that FTCA claims typically accrue "at the time of injury"). In any case, the apparent misstatement was unnecessary to our holding, which was that, as in this case, the diligence-discovery rule of accrual applied and therefore the claim did not accrue until the plaintiff knew enough about both the fact of her injury and its potential iatrogenic cause to protect herself by seeking legal advice. See Cent. Va. Cmty. Coll. v. Katz, 546 U.S. 356, 363 (2006); Donovan v. Red Star Marine Servs., Inc., 739 F.2d 774, 782 (2d Cir. 1984).

The diligence-discovery rule sets the accrual date at the time when, "with reasonable diligence," the plaintiff "has or . . . should have discovered the critical facts of both his injury and its cause." Barrett, 689 F.2d at 327, citing United States v. Kubrick, 444 U.S. 111, 120 n.7 (1979). This "is not an exacting requirement." Kronisch, 150 F.3d at 121. A claim will accrue when the plaintiff knows, or should know, enough "to protect himself by seeking legal advice." Id. (internal quotation marks omitted). Once an injured party (or in this case her guardian) knows enough to warrant consultation with counsel, and acts with diligence (as did Ms. Castillo) to undertake such consultation, conscientious counsel will have ample time to protect the client's interest by investigating the case and determining whether, when, where, and against whom to bring suit. The diligent-discovery rule protects plaintiffs who are either experiencing the latent effects of a previously unknown injury or struggling to uncover the underlying cause of their injuries from having their claims time-barred before they could reasonably be expected to bring suit; at the same time, the rule avoids unduly extending the limitations period for those who could have timely presented their claim to DHHS had they acted diligently in protecting their interests.

We review de novo the district court's determination that A.Q.C.'s claim is barred by the statute of limitations. Id. at 120. Because the government does not challenge the district court's application of the diligence-discovery rule of accrual to A.Q.C.'s claim, we must determine when Ms. Castillo knew enough about the critical facts of A.Q.C.'s

8

injury and its cause to trigger the limitations period. See id. at 121.

The "critical facts" of A.Q.C.'s injury were readily discernable shortly after her February 1, 2005, birth. By June, Erb's palsy had been identified as the cause of the weakness in her left arm and left leg. Ms. Castillo was well aware of that diagnosis, and it is that injury which forms the basis of this action. See A.Q.C., 715 F. Supp. 2d at 455 n.2 ("Despite the sweeping allegations contained in the amended complaint, plaintiff's counsel explained at oral argument that the plaintiff's injuries were principally limited to problems with the nerves in her shoulders."). Ms. Castillo was therefore aware of the critical facts of her daughter's injury no later than June 2005, well before the December 2005 accrual date found by the district court.

Since Ms. Castillo knew the critical facts of her daughter's injury at or near the time of her birth, any claim related to that injury accrued once Ms. Castillo had reason to suspect that A.Q.C.'s injury was iatrogenic.[3] Kronisch, 150 F.3d at 121. The government submits that Ms. Castillo had such knowledge when the early intervention counselor raised the possibility of medical malpractice and encouraged her to seek legal advice. A.Q.C. disagrees, insisting that Ms. Castillo could not have suspected that the injury was iatrogenic until she retained counsel, which then received and reviewed the relevant

---

[3] She need not have suspected negligence for the claim to have accrued. See Kubrick, 444 U.S. at 123. A plaintiff "armed with the facts about the harm done to him[] can protect himself by seeking advice in the medical and legal community" to determine whether his injury was negligently caused, and the FTCA's two-year limitations period provides ample time for that investigation. Id.

9

medical records. Our decision in <u>Valdez</u>, 518 F.3d 173, goes a long way toward resolving that dispute in favor of the government.

Like the case now before us, <u>Valdez</u> dealt with allegations of medical malpractice. Elon Valdez and her mother, Tiffany Donely, alleged that their doctor's negligence caused Elon to suffer severe brain damage shortly after her December 13, 2000, birth. 518 F.3d at 175-76. Although Elon's injury was immediately evident, Donely waited until June 4, 2003, to file suit.[4] <u>Id</u>. at 180. The question on appeal was whether the claim accrued before June 3, 2001. <u>Id</u>. at 181. We therefore had to determine when Donely discovered – or with reasonable diligence should have discovered – the potential iatrogenic cause of Elon's injury. <u>Id</u>. at 176-77.

The record demonstrated that Donely had no reason to believe that "there was a potential doctor-related cause" of her daughter's injury before Elon was discharged from the hospital on March 10, 2001. <u>Id</u>. at 175, 179. It also showed that on February 12, 2002, Donely retained counsel, thereby demonstrating "sufficient knowledge of the

---

[4] When a plaintiff, unaware that his claim is governed by the FTCA, commences a civil action against a federal employee without first presenting that claim to the appropriate federal agency and thereafter has his claim dismissed for failure to comply with the administrative requirements of 28 U.S.C. § 2675(a), the Westfall Act, Pub. L. No. 100-694, 102 Stat. 4563 (1988), extends the limitations period contained in 28 U.S.C. § 2401(b). In those circumstances, the plaintiff's claim will be treated as timely presented if (1) "the claim would have been timely had it been filed on the date the underlying civil action was commenced," and (2) it "is presented to the appropriate Federal agency within 60 days after dismissal of the civil action." 28 U.S.C. § 2679(d)(5). A.Q.C. does not contend that the Westfall Act applies to the facts of this case, presumably because a claim here would already have been belated when the state-court action was filed.

possible iatrogenic cause of the injury to seek legal assistance." Id. at 180.  However, the record did not reveal what transpired during the eleven months between Elon's discharge and Donely's retention of counsel.  The record was therefore "silent with respect to the circumstances that led Ms. Donely to seek legal assistance," and it did not indicate "how long she had delayed in seeking legal advice after she had reason to suspect that the cause of Elon's injury was related to her medical treatment."  Id.  We were therefore unable to pinpoint the date on which the claim accrued.

The key to resolving the dispute now before us, however, is not the specific date of accrual in Valdez, but rather our refusal to find that Elon's claim could not have accrued until Donely retained counsel.  Instead of resolving the case in that manner, we remanded for a determination of what prompted Donely to seek representation.  Id. at 182.  We therefore implicitly held that medical malpractice claims brought under the FTCA can, and often will, accrue *before* a plaintiff actually retains counsel and before counsel requests, let alone receives, the relevant medical records.  Otherwise, Donely's claim – filed within two years of the date that she retained counsel – would have been timely, and there would have been no need for remand to determine the date of accrual.

That a medical malpractice claim will often accrue before counsel is retained makes perfect sense.  An accrual date that turns on when a plaintiff (or his lawyers) finally decides to take action, rather than when the plaintiff was sufficiently alerted to the appropriateness of seeking legal advice, would render the limitations period meaningless.

11

Under A.Q.C.'s proposed rule, a plaintiff sufficiently alerted who fails to seek counsel or who retains counsel too complacent to promptly research his claim would, by virtue of that inaction, be saved from the burden that Congress placed on FTCA plaintiffs in enacting 28 U.S.C. § 2401(b). Moreover, since Section 2401(b) was designed in part to keep "courts from having to deal with cases in which the search for truth may be seriously impaired" by the passage of time, Kubrick, 444 U.S. at 117, such a result would undermine the statutory scheme by unduly and unpredictably lengthening the limitations period. As we said in Kronisch, a claim accrues when the plaintiff knows, or should know, enough "to protect himself by seeking legal advice." 150 F.3d at 121 (internal quotation marks omitted). Transparently, an injured party can know enough to consult counsel before she actually does so – let alone before counsel has fully investigated the case or agreed to be retained. We therefore easily reject A.Q.C.'s argument that her claim could not have accrued until her retained counsel had access to the relevant medical records, a step far beyond an initial consultation.

Instead of mechanically setting the date of accrual to coincide with the retention of counsel, the receipt of medical records, or any other event in the litigation process, Valdez requires that we determine when Ms. Castillo was "told of or had reason to suspect" that "the injury [A.Q.C.] suffered related in some way to the medical treatment [s]he received." 518 F.3d at 177, 180. That is the date by which Ms. Castillo had sufficient knowledge to protect A.Q.C. by seeking legal advice, and it is therefore the date

12

on which A.Q.C.'s claim accrued. See id. at 180; Kronisch, 150 F.3d at 121.

There is a strong argument that Ms. Castillo's December 2005 conversation with the early intervention counselor provided Ms. Castillo with the requisite reason to suspect that A.Q.C.'s injury was "related in some way to the medical treatment" that she received. Valdez, 518 F.3d at 177. By then, Ms. Castillo knew that her daughter was injured at or around the time of her birth. She had also consulted with an early intervention counselor whose job it was to ensure that A.Q.C. received the care that her injury required. After sharing some of A.Q.C.'s medical records with that counselor, Ms. Castillo was informed that A.Q.C.'s injury may have resulted from medical malpractice. At that point, Ms. Castillo had at least some reason to suspect that A.Q.C.'s injury was related in some way to the treatment that she had received. Indeed, the fact that Ms. Castillo translated that belief into action by contacting Fitzgerald & Fitzgerald in late February 2006 and provided the Firm with "a lot of information" about her pregnancy and A.Q.C.'s birth and current condition suggests that the advice from the early intervention counselor was precisely of the sort that would cause a reasonable person to seek "to protect himself by seeking legal advice." Kronisch 150 F.3d at 121 (internal quotation marks omitted).[5]

---

[5] Because nothing in the record reveals the training or level of medical expertise required of early intervention counselors, A.Q.C. argues that Ms. Castillo "could not have reasonably believed that her daughter's injuries . . . were iatrogenic" based on that conversation alone. That argument is undermined by A.Q.C.'s insistence that her claim accrued once her *lawyers* – whose law licenses do not certify any expertise in obstetrics – received her medical records. We have no reason to believe that lawyers as a class have any more expertise in delivery room procedure than the early intervention counselor A.Q.C. attempts to discredit. At any rate, the question is not whether either the lawyers or the

13

Not every conversation related to the nature of an injury, or the possibility of a plausible claim of medical malpractice related to that injury, will trigger the accrual date. The key, again, is identifying the time by which the plaintiff is "told of or had reason to suspect" that "the injury suffered related in some way to the medical treatment . . . received." Valdez, 518 F.3d at 177, 180. The record contains few details of Ms. Castillo's conversation with the counselor; Ms. Castillo says only that the counselor told her that she "might consider" consulting an attorney. Without a more complete account of the conversation, we are reluctant to conclude definitively, as did the district court, that the conversation itself was sufficient to put Ms. Castillo on notice that she should take action to protect her rights.

We need not decide, however, whether the conversation alone was sufficient to trigger accrual of the cause of action, because it is beyond question that Ms. Castillo was sufficiently on notice by the time she first consulted counsel in February 2006. By that time, Ms. Castillo had received information from the counselor, had had ample time to absorb the counselor's suggestion, and had noticed the law firm's advertisement that discussed injuries similar to A.Q.C.'s and indicated that such injuries "might [be] caused by medical malpractice during the birthing process." On this combination of facts, a

counselor have sufficient expertise to deliver babies or authoritatively evaluate a physician's performance, but simply whether the facts available to Ms. Castillo after conferring with the counselor were sufficient to warrant a reasonable person in believing that she should consult an attorney to protect her interests. We have no trouble concluding (as indeed did Ms. Castillo herself) that they were.

reasonable person was surely in a position to understand that it would make sense to inquire into the possibility that the injury was iatrogenic. And indeed Ms. Castillo herself drew exactly that conclusion. Thus, the statute of limitations began to run *at least* as of the time Ms. Castillo actually undertook to consult counsel about the possibility of a malpractice action. Because that date is itself more than two years prior to the presentation of a claim to DHHS in April 2008, we need not determine the precise moment at which the information available to Ms. Castillo was sufficient to trigger accrual of the cause of action.

We emphasize, as we did in Valdez, that it is not the attorney consultation itself that triggers the accrual date, but the acquisition by the prospective plaintiff of sufficient information suggesting that an iatrogenic injury may have occurred that she knows, or should know, enough "to protect [her]self by seeking legal advice." Kronisch, 150 F.3d at 121 (internal quotation marks omitted). We only hold that Ms. Castillo had that level of information at or before the time she consulted Fitzgerald & Fitzgerald in February 2006. As of that date, she was aware of the need to inquire further in order to protect her rights. From that point, she and her lawyers had ample time to investigate the case and determine whether, against whom, and in what forum to bring a malpractice action. Our conclusion thus gives ample protection to plaintiffs who cannot be expected to assess the potential for an action themselves. Unlike the rule advocated by plaintiff, however, it provides no cover for temporizing plaintiffs or dilatory attorneys. If the cause of action

15

did not accrue until the attorneys obtained and reviewed the medical records, even had Ms. Castillo waited three, four, or ten years before retaining counsel, or had the Firm waited a similarly long time before beginning its investigation, that inaction would not have prevented this claim from accruing. Attorneys would therefore be able to set the accrual date to coincide with their own litigation strategy, regardless of the length of the delay. But the "obvious purpose" of Section 2401(b) is "to encourage the prompt presentation of claims" and courts "are not free to construe it so as to defeat [that] purpose." Kubrick, 444 U.S. at 117.

Accordingly, plaintiff's cause of action accrued no later than February 2006, and the presentation of the claim to DHHS in April 2008 was untimely.

II. Equitable Tolling

A.Q.C. submits that the doctrine of equitable tolling saves her otherwise untimely complaint. While it is not clear that equitable tolling is even available in medical malpractice actions brought pursuant to the FTCA,[6] we need not resolve that issue here

---

[6] In John R. Sand & Gravel Co. v. United States, the Supreme Court determined that some statutes of limitations enacted to "limit[] the scope of a government waiver of sovereign immunity" are "more absolute" and should be read "as forbidding a court to consider whether certain equitable considerations warrant extending [the] limitations period." 552 U.S. 130, 133-34 (2008). We have not yet addressed whether that ruling precludes equitable tolling of the limitations period set out in 28 U.S.C. § 2401(b), a question that divides our sister circuits. Compare Santos ex rel. Beato v. United States, 559 F.3d 189, 194-96 (3d Cir. 2009) (concluding that, even after John R. Sand & Gravel, equitable tolling is available under the FTCA), with Marley v. United States, 567 F.3d 1030, 1037 (9th Cir. 2009) (relying in part on John R. Sand & Gravel to conclude that "§ 2401(b) is jurisdictional" and therefore courts "must refrain from using equitable estoppel or equitable tolling to excuse . . . untimeliness"). Because the facts of this case provide no reason for us to toll the limitations period, we need

16

because, even if available, the doctrine is inapplicable to the facts of this case.

"Generally, a litigant seeking equitable tolling bears the burden of establishing two elements: (1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way." Pace v. DiGuglielmo, 544 U.S. 408, 418 (2005). Because statutes of limitations "protect important social interests in certainty, accuracy, and repose," Cada v. Baxter Healthcare Corp., 920 F.2d 446, 453 (7th Cir. 1990), equitable tolling is considered a drastic remedy applicable only in "rare and exceptional circumstance[s]," Smith v. McGinnis, 208 F.3d 13, 17 (2d Cir. 2000) (internal quotation marks and alteration omitted).

The district court determined that equitable tolling was inappropriate in this case because the Firm failed to diligently pursue A.Q.C.'s claim. A.Q.C., 715 F. Supp. 2d at 461-63. We review that determination for abuse of discretion, see Zerilli-Edelglass v. N.Y. City Transit Auth., 333 F.3d 74, 81 (2d Cir. 2003), and find no error in the district court's reasoning or conclusion.

As the district court observed,

> the undisputed evidence indicates that literally nothing was done to determine whether Dr. Castillo was a federally-deemed employee during the two years following the accrual of the plaintiff's claims. From December 2005 to April 2006, the plaintiff's mother identified and retained an attorney. Once retained, plaintiff's counsel, despite having the information necessary to ascertain the proper defendants shortly after their retention, merely conducted three periodic, internal reviews over

not decide whether equitable tolling might be available under different circumstances.

17

the following year-and-a-half to determine whether the case should move forward.

A.Q.C., 715 F. Supp. 2d at 461. That accurate summary depicts complacency, not diligence.

It is fundamental that a lawyer investigating a possible claim on behalf of a client needs to investigate not only whether a potential claim exists in the abstract, but also who would be the appropriate parties to sue, and what, if any, restrictions on the time and forum for bringing such a claim might exist. Moreover, Fitzgerald & Fitzgerald, which advertises itself as "a top firm in the medical malpractice field," had previous experience with this very issue. On at least two prior occasions, the United States removed to federal court medical malpractice claims against persons deemed federal employees that the Firm had improvidently filed in state court. It is hard to understand why any lawyer – let alone a lawyer at a firm specializing in medical malpractice with specific prior acquaintance with this issue – would not investigate the federal nature of potential defendants as part of standard due diligence in every medical malpractice case. Having neglected to take that simple step, the Firm cannot now argue that it diligently pursued this claim on A.Q.C.'s behalf.

Moreover, no extraordinary obstacle prevented the Firm from identifying Dr. Castillo's federal status (and therefore the particular requirements for filing suit under the FTCA) in a timely way. Even the most cursory investigation would have revealed the federal nature of A.Q.C.'s claim. To determine that status, all the Firm had to do was

18

either call a government-sponsored toll-free number or enter "Urban Health Plan" into the online database maintained by the Health Resources and Services Administration, an agency within DHHS. Had the Firm taken either of those steps within the first twenty-two months of its relationship with Ms. Castillo, it would have learned – just as it did in February 2008 when it belatedly chose to make precisely that inquiry – that A.Q.C.'s claim was covered by the FTCA. As a result, the Firm cannot now claim that the federal nature of this action was somehow hidden from view.

Nor can there be any argument that the Firm was without reason to suspect that A.Q.C. might choose to bring suit against either UHP or Dr. Castillo. A.Q.C.'s counsel explained at oral argument that the Firm had inquired into UHP's liability for A.Q.C.'s injury at the very beginning of its investigation. In fact, on May 16, 2006 – a full nineteen months *before* the limitations period expired – the Firm contacted UHP and requested A.Q.C.'s prenatal records detailing the treatment that Dr. Castillo provided. Moreover, the Firm admits that by August 2006 it believed that A.Q.C.'s injury was "caused by medical malpractice during . . . labor and delivery." Since it knew that Dr. Castillo was the delivery room doctor and that he had provided prenatal care at a UHP facility, this is not a case where the identity of a potential defendant was somehow obscured.

The Firm, which was responsible for investigating these matters as a result of its retainer agreement, claims that it had no reason "to suspect [either that] the Urban Health

Plan, Inc. was a federally funded clinic or that Dr. Castillo would be deemed a federal employee." But common sense – let alone years of experience in medical malpractice litigation – would alert a reasonable advocate to the possibility that a community health clinic with the professed mission of "improv[ing] the health status of undeserved communities" would be federally funded. In fact, the statutory scheme at issue defines "health center" for purposes of FTCA coverage in part as "an entity that serves a population that is medically underserved." 42 U.S.C. § 254b(a)(1). Any investigation into UHP would therefore have alerted the Firm to the potential federal nature of this claim. Indeed, A.Q.C. points to no previously undisclosed fact that triggered the Firm's eventual inquiry; it appears that it simply finally occurred to a Firm lawyer, based on the same facts that had been available essentially from the day Ms. Castillo first approached the Firm, to make the inquiry.

Finally, A.Q.C. notes that there may be some tension between denying equitable tolling in this case and dicta in Valdez suggesting that the government's "failure to disclose" the federal nature of physicians working "in what appear to be private clinics" might constitute "a special circumstance" warranting equitable tolling. 518 F.3d at 183. However, the concern that motivated us to opine on the theoretical possibility of equitable tolling under those circumstances was the lack of "a regulation that would [have] require[d] notice to a patient that the doctor rendering service to him is an employee of the United States." Id. Here, the record makes clear that DHHS has provided both a toll-

20

free number and a publicly available database through which a plaintiff can ascertain the federal nature of the relevant defendant. While that might be of little use to a layperson with no knowledge of the relevant statutory scheme, A.Q.C. was represented by counsel who had previously confronted factually similar circumstances and therefore had specific notice of the fact that some ostensibly private doctors are deemed federal employees for purposes of medical malpractice claims under the FTCA. Under these circumstances, there is no meaningful difference between the regulation we hypothesized in Valdez and the easily accessible public databases that identified UHP's federal status.[7] We therefore reject A.Q.C.'s argument that Valdez requires equitable tolling whenever an FTCA plaintiff is unaware of the federal nature of the defendant.

Consistent with longstanding basic principles of equitable tolling, see Baldwin County Welcome Ctr. v. Brown, 466 U.S. 147, 151 (1984); South v. Saab Cars USA, Inc., 28 F.3d 9, 12 (2d Cir. 1994), Valdez stated that equitable tolling is available (if at all) only when the plaintiff "satisfied the due diligence requirement necessary for her to take advantage of [that] doctrine," 518 F.3d at 185. As explained above, Fitzgerald & Fitzgerald, acting as retained counsel for the plaintiff here, did not act diligently. We

---

[7] A.Q.C.'s reliance on the Third Circuit's opinion in Santos ex rel. Beato v. United States, 559 F.3d 189 (3d Cir. 2009), is similarly unavailing. That decision rested on the perceived lack of "publicly available information [that] would have alerted [the plaintiff] that the allegedly negligent healthcare providers . . . had been deemed federal employees." Id. at 202. Here, unlike in Santos, the record identifies multiple publicly available sources of that information.

21

therefore agree with the district court that the doctrine of equitable tolling, if applicable at all to claims of this kind, cannot save A.Q.C.'s otherwise untimely complaint.

## CONCLUSION

We have considered all of A.Q.C.'s remaining arguments on appeal and find them to be without merit.  Accordingly, for the foregoing reasons, the judgment of the district court is AFFIRMED.