12-3713-cv
Phillips v. Generations Family Health Center

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

————————

August Term, 2012

(Argued: March 5, 2013        Decided: June 28, 2013)

Docket No. 12-3713-cv

CHRISTOPHER PHILLIPS, Administrator for the Estate of Karen Cato,

*Plaintiff-Appellant*,

—v.—

GENERATIONS FAMILY HEALTH CENTER,

*Defendant-Appellee*.

————————

B e f o r e : KATZMANN, PARKER, *Circuit Judges*, and CEDARBAUM, *District Judge*.[*]

————————

Appeal from a judgment of the United States District Court for the District of Connecticut (Bryant, *J*.) dismissing Plaintiff-Appellant's claim as time-barred. We hold that the district court may have mistakenly believed that equitable tolling was not warranted in this case as a matter of law based on our prior decision in *A.Q.C. ex rel. Castillo v. United States*, 656 F.3d 135, 142 (2d Cir. 2011), and we therefore vacate and remand for the court to exercise its discretion in the first instance under the correct legal standard. **VACATED and REMANDED**.

————————

_____

[*]  The Honorable Miriam Goldman Cedarbaum, of the United States District Court for the Southern District of New York, sitting by designation.

GERHARDT M. NIELSEN, Pegalis & Erickson, LLC, Lake Success, NY (Vincent M. DeAngelo, Offices of Vincent DeAngelo, LLC, Weatogue, CT, *on the brief*), *for Plaintiff-Appellant.*

LAUREN M. NASH (David C. Nelson & Sandra S. Glover, *on the brief*), Assistant United States Attorneys *for* David B. Fein, United States Attorney for the District of Connecticut, *for Defendant-Appellee.*

_____

KATZMANN, *Circuit Judge*:

Plaintiff-Appellant Christopher Phillips appeals from an August 20, 2012, judgment of the United States District Court for the District of Connecticut (Bryant, *J.*), which dismissed Phillips's medical malpractice claim for lack of subject matter jurisdiction. Phillips, as the administrator of his sister Karen Cato's estate, sued Defendant-Appellee Generations Family Health Center ("Generations") in Connecticut state court, alleging that Generations negligently failed to timely diagnose the colon cancer that caused Cato's death. Generations, however, receives federal funding under the Public Health Service Act and has been "deemed" a federal employee by the Department of Health and Human Services ("HHS"). *See* 42 U.S.C. § 233(g)-(n). The case was removed to federal court, and the court applied the statute of limitations and procedural requirements of the Federal Tort Claims Act ("FTCA"). Ultimately, the district court dismissed the case on the ground that Phillips had failed to file an administrative claim with HHS within the FTCA's limitations period. For the reasons stated below, we vacate the judgment of the district court and remand for the district court to reconsider the case in light of our clarification of the governing legal standard.[1]

_____

[1] We reject some of Phillips's alternative arguments in a separate summary order issued simultaneously with this Opinion.

**BACKGROUND**

Karen Cato was diagnosed with advanced colon cancer in late 2008 or early 2009. She was only 41 years old at the time. In January of 2009, Cato consulted with Gerhardt Nielsen, a lawyer for Pegalis & Erickson, LLC ("Pegalis"), about whether she might have a medical malpractice claim against her health care provider, Generations, for failure to timely diagnose her cancer. Nielsen informed Cato that an expert would need to review her medical records to determine whether Generations had acted negligently, and he therefore requested Cato's medical records from Generations and another health care provider. However, he warned Cato that it was unlikely that she would have a claim because the standard of care for a patient of her age did not necessarily require routine colon cancer screening. Cato told her brother, Phillips, that she had spoken to a lawyer at Pegalis about a prospective medical malpractice claim.

Cato passed away on April 6, 2009. She was survived by Phillips, an adult son named Zane Deshong, and a three-year old son. No later than April 27, 2009,[2] Phillips called Nielsen to inform the lawyer that Cato had died and that Deshong would be contacting Nielsen shortly to discuss Cato's legal affairs. Deshong, who was on active military duty on a submarine in the Pacific, was impossible to reach for months at a time. Because Nielsen believed that he did not have authority to review any of Cato's medical records absent permission from Deshong, Nielsen took no further action on the case until Deshong called Pegalis on July 6, 2009. Deshong gave Nielsen permission to review the medical records, and Nielsen advised that they should appoint someone to serve as the administrator of Cato's estate.

---

[2] The parties did not submit any evidence about the precise date of the call, but the district court determined that the latest possible date was April 27, 2009, and neither party disputes this factual finding on appeal.

"[O]ver the next eight months" the firm "attempted to work with [Deshong] to attend to legal details," but "this became impractical" because Deshong remained on active duty in the Pacific. App'x at 32. Deshong, therefore, informed Nielsen in March of 2010 that Phillips would assume responsibility for Cato's legal affairs. In July 2010, Phillips again contacted Nielsen and learned that Pegalis had received some of Cato's medical records but required further records from another provider, Lawrence & Memorial Hospital. Nielsen advised Phillips to become the administrator of Cato's estate so that Phillips could request the additional records. According to Nielsen, Pegalis would coordinate with the Law Offices of Vincent DeAngelo ("the DeAngelo office"), a Connecticut law firm, on these probate-related matters. Nielsen also explained that Cato's records needed to be reviewed by a medical expert before a malpractice claim could be filed under Connecticut law and that the records from Lawrence & Memorial were essential to the expert's analysis.[3]

In order to determine Generations's ownership and funding structure, Nielsen visited Generations's website, looked at its medical records, and had a paralegal perform a corporate search. According to Nielsen:

> The website for Generations did not contain any information indicating that this was a federally funded facility; nowhere on the site did it indicate that there was any federal funding involved. The website did indicate that "Generations Family Health Center receives Health Care to the Homeless . . . funding agency wide. . . ." An internet search . . . for "Health Care to the Homeless" revealed that there are numerous private and state funded organizations nationwide providing aid for the homeless, but revealed *no connection* of such programs to the federal government or to federal funding . . . . If Generations was a federally-funded

---

[3]  Conn. Gen. Stat. § 52-190a(a) requires that a medical malpractice complaint contain a certification that a "reasonable inquiry" has given rise to a "good faith belief that grounds exist." The plaintiff must submit a "written and signed opinion" of a medical expert to support this good faith belief.

facility, the website not only did not reveal that fact but contained information which, if logically considered, effectively concealed that funding. . . . Everything about Generations suggested that it was a private, non-governmental, entity. It certainly held itself out that way. The Generations website affirmatively creates the impression that this is a private health care facility, not a branch of the federal Public Health Service.

App'x at 35. Furthermore, a corporate search at the Connecticut Secretary of State's Office did not reveal that Generations was a federal entity. Although HHS has created a publicly accessible online database of all its deemed employees and established a toll-free phone hotline that prospective plaintiffs can call to determine if a particular provider is a federal employee, Nielsen was apparently unaware of these resources and, in any event, did not suspect that Generations might be a federal employee.

After Phillips was appointed as the administrator of Cato's estate on March 24, 2011, he requested Cato's medical records from Lawrence & Memorial Hospital. However, Nielsen was concerned that Connecticut's two-year statute of limitations might expire before Phillips received the records and before the medical expert could complete the report required by Conn. Gen. Stat. § 52-190a(a). To avoid this danger, on March 31, 2011, the DeAngelo office filed a petition with the Connecticut Superior Court for an automatic ninety-day extension of time for Phillips to file his potential complaint. *See* Conn. Gen. Stat. § 52-190a(b). When it became clear that the medical records from Lawrence & Memorial still would not arrive in time, the medical expert concluded on the basis of the existing records that Phillips had a good faith basis for a malpractice claim. Phillips filed his complaint against Generations in Connecticut Superior Court on June 30, 2011. The suit was timely under Connecticut law.

Over four months later, the United States Attorney's Office notified Phillips that the case had been removed to federal court because Generations and its employees "were acting within

the scope of federal employment as employees of the Public Health Service at the time of the incident out of which the Plaintiff's claim arose." App'x at 19. In short, certain health centers that receive federal funding under the Public Health Service Act and serve "medically underserved" populations can be "deemed" by HHS as federal health providers even if they are private organizations. *See* 42 U.S.C. §§ 233(g)-(n), 254b. These federal health providers are considered federal employees for purposes of medical malpractice claims, and plaintiffs wishing to sue the providers or their employees must comply with the requirements of the FTCA. *See id.*

Under the FTCA, before a claimant can file suit, he or she must first present the claim to the appropriate federal agency (in this case HHS) within two years of the date the claim accrued. 28 U.S.C. § 2401(b). The claimant can only initiate his or her lawsuit once the claim has been denied by the agency (or if the agency has failed to make a decision within six months after the claim was filed). 28 U.S.C. § 2675(a). Here, after the case was removed to federal court, the government moved to dismiss Phillips's complaint under Federal Rule of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction because Phillips had failed to file an administrative claim with HHS.

Phillips argued that, even though he had not filed an administrative claim with HHS within the FTCA's limitations period, he was eligible to take advantage of the savings clause of the so-called Westfall Act. Under the Westfall Act, where the plaintiff has filed his or her tort suit against the wrong party, an otherwise untimely administrative claim filed after the federal government has entered the case "shall be deemed to be timely presented . . . if . . . the claim would have been timely [under the FTCA's two-year statute of limitations] had it been filed on the date the underlying civil action was commenced." 28 U.S.C. § 2679(d)(5). As a practical

-6-

matter, when a district court determines that the savings clause applies, it typically dismisses the plaintiff's suit without prejudice and grants the plaintiff leave to file an administrative claim with the appropriate agency. *See id.*

Phillips contended that he "commenced" his "underlying civil action" in Connecticut state court within the FTCA's statute of limitations for three separate reasons: (1) his claim did not accrue until at the earliest mid-July of 2009, which was less than two years before he filed suit; (2) he "commenced" his state action on March 31, 2011, by filing his petition for an extension of time with the Connecticut Superior Court; and (3) the limitations period should have been equitably tolled because there was no reason to suspect that Generations was a federal entity. The district court rejected each of these three arguments and dismissed Phillips's suit with prejudice. On the first issue, the district court determined that Phillips's claim accrued at the latest on April 27, 2009, meaning that his June 30, 2011, complaint was not filed within the FTCA's statute of limitations. The district court also rejected Phillips's second argument, holding that the filing of a petition for extension of time to file a *potential* complaint could not commence an action. *Phillips v. Generations Family Health Ctr.*, No. 11-CV-1752, 2012 WL 3580532, at *4-*8 (D. Conn. Aug. 17, 2012).

Lastly, assuming *arguendo* that equitable tolling was available under the FTCA, the district court held that Phillips would not be entitled to tolling because he and his lawyers failed to diligently investigate Generations's federal status. The district court concluded that Pegalis could have "easily discovered" Generations's status by visiting the HHS online database of deemed federal employees or by calling the government's toll-free hotline. *Id.* at *10. Moreover, according to the district court, Pegalis "should have known to investigate the federal

nature of a potential defendant as part of its standard due diligence" because it "advertises itself as . . . a Top Tier medical malpractice firm." *Id.* at *9 (internal quotation marks omitted).

In reaching this conclusion, the district court relied almost exclusively on our recent decision in *A.Q.C. ex rel. Castillo v. United States*, 656 F.3d 135 (2d Cir. 2011), finding that the case all but dictated the result. *A.Q.C.* had held that it was not an abuse of discretion to deny equitable tolling to a plaintiff whose law firm did "literally nothing" to determine the federal status of plaintiff's health care provider. *Id.* at 144. The district court here, quoting *A.Q.C.*, reasoned that "it is hard to understand why any lawyer[,] let alone a lawyer at a firm specializing in medical malpractice[,] . . . would not investigate the federal nature of potential defendants as part of standard due diligence in every medical malpractice case." *Phillips*, 2012 WL 3580532, at * 9 (quoting *A.Q.C.*, 656 F.3d at 145). Furthermore, the district court rejected Phillips's contention that there was no reason to suspect that Generations was federally funded or a deemed federal employee, concluding that "common sense—let alone years of experience in medical malpractice litigation—would alert a reasonable advocate to the possibility that a community health clinic" that provides healthcare to homeless individuals might be federally funded. *Id.* at *10 (quoting *A.Q.C.*, 656 F.3d at 145).

As explained in a separate Summary Order filed simultaneously with this Opinion, the district court properly rejected Phillips's first two arguments. However, for the reasons discussed below, we are concerned that the district court may have mistakenly interpreted our opinion in *A.Q.C.* to dictate the result in this case as a matter of law. Most importantly, the district court did not fully consider whether, despite the differences between this case and *A.Q.C.*, Phillips's lawyers had reason to know that they should have investigated Generations's

federal status. Because we cannot be certain on the present record whether the district court's decision should be affirmed under the correct legal standard, we remand for reconsideration.

## DISCUSSION

### I

We review a district court's determination that equitable tolling is inappropriate for "abuse of discretion." *A.Q.C.*, 656 F.3d at 144. We have previously explained, however, that this term "obscures more than it reveals" and that the "operative review standard [for equitable tolling determinations] in the end will depend on what aspect of the lower court's decision is challenged." *Belot v. Burge*, 490 F.3d 201, 206 (2d Cir. 2007). "If a district court denies equitable tolling on the belief that the decision was compelled by law" or "[i]f the decision to deny tolling was premised on an incorrect or inaccurate view of what the law requires," "the decision should be reviewed *de novo*." *Id.* Along the same lines, "if the decision to deny tolling was premised on a factual finding, the factual finding should be reviewed for clear error." *Id.* Only where the "court has understood the governing law correctly, . . . has based its decision on findings of fact which were supported by the evidence, [and] the challenge is addressed to whether the [district] court's decision is . . . within the range of possible permissible decisions" will we actually review for "abuse of discretion" in both "name" and "operation." *Id.* at 206-07.

### II

Whether equitable tolling is available at all under the FTCA is an open question in this circuit. Although we have sometimes hinted that equitable tolling might be appropriate, *see Valdez ex rel. Donely v. United States*, 518 F.3d 173, 177, 184-85 (2d Cir. 2008); *Celestine v. Mount Vernon Neighborhood Health Ctr.*, 403 F.3d 76, 84 (2d Cir. 2005), we have explicitly

declined to resolve whether the FTCA's statute of limitations is "jurisdictional" and, hence, not subject to tolling, *A.Q.C.*, 656 F.3d at 144 n.6. The district court similarly declined to address this issue and, instead, held that Phillips would not be entitled to equitable tolling even if it were available. As such, in reviewing the district court's conclusion, we will also assume *arguendo* that equitable tolling is available and analyze whether Phillips would be entitled to tolling under the particular facts of his case. We leave it for the district court to consider in the first instance on remand, if necessary, whether the FTCA's statute of limitations is jurisdictional.

Although equitable tolling is "applicable only in rare and exceptional circumstances," *A.Q.C.*, 656 F.3d at 144 (internal quotation marks omitted), we have recognized that it is sometimes necessary "as a matter of fairness," *Johnson v. Nyack Hosp.*, 86 F.3d 8, 12 (2d Cir. 1996) (internal quotation marks omitted). "To qualify for [equitable tolling,] the [plaintiff] must establish that extraordinary circumstances prevented him from filing his [claim] on time, and that he acted with reasonable diligence throughout the period he seeks to toll." *Doe v. Menefee*, 391 F.3d 147, 159 (2d Cir. 2004) (internal quotation marks omitted). The plaintiff must also show that his lawyers were reasonably diligent in determining "the appropriate parties to sue, and what, if any, restrictions on the time and forum for bringing such a claim might exist." *A.Q.C.*, 656 F.3d at 145.

We have had only a few opportunities to consider how this standard applies in this specific context, *i.e.*, where a medical malpractice plaintiff does not realize that her health provider is a deemed federal employee and files her claim in state court after the FTCA's limitations period has expired. First, in *Celestine v. Mount Vernon Neighborhood Health Center*, we cautioned that where "the federal statute of limitations is shorter than the state

statute, a plaintiff (reasonably thinking that he has a state law claim) may . . . bring suit within the state statute-of-limitations window," but still "find himself barred under the Westfall Act" because the suit was "outside of the federal" limitations period. 403 F.3d at 84. Although we decided the case on other grounds, we opined that it would be "unjust to treat such a timely state suit as federally barred" and that this concern "may well require equitable tolling" under such circumstances. *Id.*

A few years later, in *Valdez*, we again suggested that the government's failure to disclose that health providers are federal employees "may warrant equitable tolling" because, otherwise, patients are "not aware" of their providers' federal status. 518 F.3d at 183. We explicitly faulted HHS for "creat[ing] a potential statute of limitations trap" by refusing to "formulat[e] a regulation that would require notice to a patient that the doctor rendering service to him is an employee of the United States." *Id.* We also observed that "[t]he number of cases in which the United States has sought to take advantage of this trap suggests that it is aware of the consequences of its failure to disclose the material facts of federal employment by doctors who might reasonably be viewed as private practitioners." *Id.* Yet, despite this knowledge, the government had done nothing to help plaintiffs avoid the potential trap. This failure, we thought, was "problematic." *Id.* at 183. Therefore, although we did not definitively resolve the issue because equitable tolling would not have saved the plaintiff's claim, we strongly criticized the government's conduct in taking advantage of these situations. *Id.*

Finally, in *A.Q.C.*, we considered whether equitable tolling was warranted for another plaintiff who fell into this "statute of limitations trap." In that case, the plaintiff's law firm was planning to file a medical malpractice suit against its client's doctor in New York state court

-11-

when it "belatedly realized[,] . . . almost by accident" that the doctor was a deemed federal

employee. *A.Q.C.*, 656 F.3d at 138. One of the plaintiff's lawyers had learned "that a doctor in

an unrelated case had been deemed a federal employee" and, therefore, placed a call to the toll-

free government hotline in order to inquire about the federal status of the defendant. *Id.* at 138-

39. Although the plaintiff's suit would have been timely under New York law, by the time the

firm realized its error, the FTCA's two year limitations period for filing an administrative claim

had expired. The plaintiff argued that the limitations period should be tolled, but the district

court found that equitable tolling was inappropriate because the law firm exhibited a lack of

diligence when it did "literally nothing . . . to determine whether [the doctor] was a federally-

deemed employee" until after the FTCA's limitations period had expired. *Id.* at 144.

On appeal, we held that the district court's decision was not an abuse of discretion. *Id.*

We thought that the case did not raise the same concerns as *Valdez* for two principal

reasons—the government had provided publicly available sources of information (the online

database and telephone hotline) about providers' federal status, and A.Q.C.'s lawyers had reason

to investigate whether the seemingly private health clinic might have been deemed a federal

employee. *Id.* at 146 (citing *Valdez*, 518 F.3d at 183-84). Although we acknowledged that the

online database and toll-free hotline established by HHS might not be helpful to every plaintiff,

we emphasized that "A.Q.C. was represented by counsel who had previously confronted

factually similar circumstances and therefore had specific notice of the fact that some ostensibly

private doctors are deemed federal employees for purposes of medical malpractice claims under

the FTCA." *Id.* "Under these circumstances," we reasoned, "there is no meaningful difference

between the regulation we hypothesized in *Valdez* [requiring health providers to notify their

patients about the provider's federal status] and the easily accessible public databases" created by HHS.[4]  *Id.*

There was no question in *A.Q.C.* (and there is no question here) that the government has created publicly available resources to help plaintiffs discover deemed employees.  Most of our discussion, therefore, involved whether A.Q.C.'s lawyers should have known to investigate the defendant's federal status.  We first explained that A.Q.C.'s law firm lacked diligence because it did not investigate the issue even though (1) it was a "top firm in the medical malpractice field" and (2) had "previous experience with th[e] very issue" when, "[o]n at least two prior occasions, the United States removed to federal court medical malpractice claims against persons deemed federal employees that the [f]irm had improvidently filed in state court."  *Id.* at 145.  We further elaborated that "[i]t is hard to understand why any lawyer—let alone a lawyer at a firm specializing in medical malpractice with specific prior acquaintance with this issue—would not investigate the federal nature of potential defendants as part of standard due diligence in every medical malpractice case."  *Id.*  Moreover, if the firm had simply looked into the issue, "[e]ven the most cursory investigation" would have shown that the plaintiff's doctor was a federal employee.  *Id.*  "[A]ll the [f]irm had to do was either call a government-sponsored toll-free number or enter [the name of the provider] into the online database maintained [by HHS]."  *Id.*

Additionally, we suggested that the plaintiff's lawyers had even greater reason to suspect that the defendant might be a deemed federal employee because "common sense" and "years of

---

[4]  We similarly distinguished the Third Circuit's decision in *Santos ex. rel. Beato v. United States*, 559 F.3d 189 (3d Cir. 2009), which held that equitable tolling was appropriate under similar circumstances, on the ground that there was no evidence in *Santos* of "publicly available information" about deemed federal employees, whereas the government in *A.Q.C.* had presented evidence about the toll-free hotline and HHS online database.  *A.Q.C.*, 656 F.3d at 146 n.7.

experience in medical malpractice litigation . . . would alert a reasonable advocate to the possibility that a community health clinic with the professed mission of 'improv[ing] the health status of underserved communities' would be federally funded." *Id.* In fact, we noted, one of the requirements for a health provider to be deemed a federal employee is that it "serves a population that is medically *underserved*." *Id.* (emphasis added).

## III

The government contends that our reasoning in *A.Q.C.* dictates the result in this case, emphasizing our pronouncement that "[i]t is hard to understand how any lawyer . . . would not investigate the federal nature of potential defendants *as part of standard due diligence in every medical malpractice case*." Appellee's Br. at 48, 51 (quoting *A.Q.C.*, 656 F.3d at 145 (emphasis added)). Although this statement, particularly given that it refers to *any* lawyer and *every* malpractice case, might at first blush appear to require that malpractice lawyers always call the federal hotline or search the HHS database, we do not agree that *A.Q.C.* established such a per se rule. As an initial matter, *A.Q.C.* did not purport to establish a blanket rule of law but instead merely reviewed the district court's decision for abuse of discretion. *See A.Q.C.*, 656 F.3d at 144. Moreover, reading our decisions in *Valdez* and *A.Q.C.* together, it is clear that we did not establish a per se rule because we relied on certain facts in *A.Q.C.* that were not present in *Valdez* and might not be present in other cases

For example, we emphasized in *A.Q.C.* that, unlike in *Valdez*, the plaintiff's law firm knew from personal experience that "ostensibly private doctors" could turn out to be deemed federal employees and, therefore, had been put on notice that inquiring about a health provider's federal status might be necessary. *Id.* at 146. In distinguishing *Valdez*, we explained that

-14-

"[u]nder *these* circumstances," *i.e.*, where the lawyers had "previously confronted factually similar" situations involving seemingly private doctors, the availability of the government's online database sufficed to assuage our concerns that a plaintiff would not be aware of the potential statute of limitations trap. *Id.* (emphasis added). We therefore implied that a lawyer's lack of knowledge that private clinics might be deemed federal employees could be relevant in determining whether the plaintiff and his lawyer exhibited sufficient diligence. Although we could have simply dismissed *Valdez* as dicta, we instead emphasized the distinctions between the cases, and thereby also implied that under *other* circumstances where the law firm did not have direct prior experience, we might reach a different result.

Additionally, we stressed in *A.Q.C.* that the plaintiff's lawyers had "reason to suspect" that the health care provider might have been a federal employee because the health clinic's mission statement used the exact same term as the federal statute defining the health providers eligible for federal status—"underserved" communities—to describe its target population. *Id.* at 145 (internal quotation marks omitted). Although we concluded that this language should have led the plaintiff's lawyers to suspect that the clinic received federal funding, we did not analyze whether lawyers would have reason to suspect that an ostensibly private entity was actually a federal employee where the provider's website was less clear about its funding sources and core mission.

Therefore, *A.Q.C.* did not impose an absolute duty on the medical malpractice bar to check the HHS online database or call the hotline in every case. We instead determined, based on all the relevant facts, that the district court did not abuse its discretion. In distinguishing *Valdez*, we also indicated that courts should consider, as part of this case-by-case analysis,

whether the plaintiff's lawyer had (or should have had) reason to suspect that the ostensibly private clinic might be a deemed federal employee. *Accord Santos*, 559 F.3d at 201, 203 (considering whether plaintiff had "been alerted to the need to explore their [providers'] federal employment status" in determining whether she was sufficiently diligent).

Hence, as we elaborate below, the proper standard here is not a per se rule that a lawyer from a "top" malpractice firm always lacks diligence if he or she does not investigate an ostensibly private defendant's federal status. Rather, the district court should consider all of the relevant facts and circumstances—including whether the plaintiff should have known to investigate the issue—to determine, utilizing its own discretion, whether the plaintiff and lawyer were sufficiently diligent. The government could probably avoid such a case-by-case inquiry by requiring, as we suggested in *Valdez*, that all deemed employees provide notice to patients about their federal status. HHS, however, has not chosen to pursue this route, and we must therefore consider whether the district court used the proper legal standard and correctly applied our precedent to the particular facts and circumstances of this case.

IV

Turning to the district court's decision, we are concerned that the court may have mistakenly interpreted *A.Q.C.* to dictate the result in this case as a matter of law and, as a result, did not consider a number of potentially relevant factors. Perhaps most importantly, the district court concluded that *A.Q.C.* dictated the result without fully considering the differences between the facts in that case and the facts here, relying heavily on *A.Q.C.*'s comment that "any lawyer" should investigate a defendant's federal status even though, as explained above, that comment should not be read to establish a per se rule. *See Phillips*, 2012 WL 3580532, at * 9 (quoting

-16-

*A.Q.C.*, 656 F.3d at 145). If there were no possibly salient differences between the cases, we would have few qualms about affirming the district court regardless of whether it interpreted *A.Q.C.* correctly. However, there are a number of distinctions that may be relevant to determining whether Phillips's lawyers were sufficiently diligent.

Many of these distinctions concern whether the plaintiff's law firm had reason to investigate if Generations was a federal employee. Although the district court considered whether Pegalis had reason to inquire about Generations's federal status, it did not address these distinctions in reaching its conclusion. The district court, for example, stressed that Pegalis advertised itself as a "top tier" medical malpractice firm but did not consider whether Pegalis had previously encountered similar circumstances involving deemed federal employees. *Id.* While we indicated in *A.Q.C.* that the law firm's status as a "top [malpractice] firm" was relevant, we placed more emphasis on the law firm's experience with similar circumstances; indeed, we distinguished *Valdez* based primarily on that fact. *See A.Q.C.*, 656 F.3d at 146. Here, unlike in *A.Q.C.*, the parties presented no evidence that Phillips's law firm had any experience with situations in which seemingly private health providers turned out to be deemed federal employees. Given that *A.Q.C.* heavily relied on the firm's prior experience with these "factually similar circumstances," the district court erred by not giving any consideration to the lack of evidence on this point.[5] *See id.* at 144, 146.

The district court also determined that Generations's mention of Healthcare to the

_____

[5] We do not mean to imply that Pegalis's status as a "top tier" malpractice firm is irrelevant. We clearly indicated in *A.Q.C.* that it was, and the district court can certainly consider it as a factor in the analysis on remand. We simply think the district court should also have considered other factors, including whether Pegalis had encountered factually similar circumstances.

-17-

Homeless on its website should have given Pegalis sufficient reason to investigate the defendant's federal status. The court relied solely on our conclusion in *A.Q.C.* that the provider's self-professed mission to serve "underserved communities" should have alerted the plaintiff's lawyers about the possibility that the clinic may have received federal funding. However, the district court did not consider that the Generations website gave less of an indication that it received federal funding.

The health clinic in *A.Q.C.* used the same language as the federal statute that defines which health care providers are eligible for federal employment status (*i.e.*, those that help "underserved" communities) to describe its overall mission, whereas the Generations website merely stated that it, as one of "various resources," received "Health Care to the Homeless" funding. App'x at 35. Evidence that Generations helped homeless individuals as one small part of its larger mission hardly leaves one with a clear impression that the clinic might be a federal entity. *See Santos*, 559 F.3d at 201 (holding that a provider's website listing that it received federal money as one of "various . . . sources" was insufficient to show that a reasonably diligent plaintiff should have investigated whether the provider had been deemed a federal employee). The parties presented no further evidence about the information on Generations's website or the services Generations provided to homeless individuals. Perhaps Generations's website could have alerted Pegalis about the need to investigate the defendant's federal status, but the district court should have considered how the information provided on the two websites differed.

In other words, whereas A.Q.C.'s law firm had ample reason to suspect that the defendant might be a federal employee—based on the firm's past experience with similar situations and the clear indication on the provider's website that the provider was probably part

-18-

of the Public Health Service—here there is notably less evidence (at least in the existing record) that the lawyers at Pegalis would have had any reason to suspect Generations's federal status. In fact, the government in this case has offered essentially no evidence to rebut Mr. Nielsen's uncontested affidavit that the Generations website effectively concealed the provider's federal status.[6] Given the state of the current record and the district court's need to consider the totality of circumstances, we cannot determine whether the district court's decision was within its permissible discretion.

There are also other potentially relevant considerations that the district court did not weigh and may want to consider on remand. The government here did not submit any evidence about how the HHS database and toll-free number operate, how they are publicized, and whether malpractice attorneys at the time would or should have known about their existence. As the government conceded at oral argument, the phone number for the toll-free hotline has been changed at least once, so even firms with prior knowledge of the hotline may not have been able to take advantage of that resource. Without any evidence on this issue, we are unsure whether Nielsen's lack of knowledge about the resources was reasonable or was a failure of diligence on his part. The law firm in *A.Q.C.* clearly knew about the government's hotline because it called the toll-free number once it finally decided to investigate the defendant's federal status, but there is no evidence that such knowledge was widespread (or even that it is widespread now). If the

---

[6] We do not suggest that the district court is limited to assessing whether Pegalis had prior experience with cases in which an apparently private defendant had been deemed a federal employee or whether Generations's website should have spurred the plaintiff's lawyers to investigate the health center's federal status. There may be other valid grounds on which to conclude, based on all of the relevant evidence, that Pegalis should have had reason to inquire about Generations's federal status or otherwise lacked diligence.

government has failed to publicize these tools, they may not act as the functional equivalent of the regulation that we suggested in *Valdez,* and may not alleviate our concerns about the government's "problematic" conduct in perpetuating an unfair "statute of limitations trap."[7] *See Valdez*, 518 F.3d at 183.

We also note that the law firm in *A.Q.C.* did "literally nothing" to investigate the defendant's status, 656 F.3d at 145, whereas Pegalis at least visited Generations's website, looked at its health records, and performed a corporate search. The Third Circuit in *Santos* found it relevant that the plaintiff's counsel took similar investigatory steps but that "none of [them] gave him a clue that the healthcare providers . . . had been deemed federal employees or that" he should contact HHS to inquire about their federal status. 559 F.3d at 200-01. For this reason, the Third Circuit concluded that it had been reasonable for the plaintiff to assume that a clinic which looked like and operated like a private clinic was, in fact, a private clinic. *Id.* at 200-01. The district court did not consider whether this factual distinction was important and should do so on remand. Although this distinction is not necessarily dispositive, it is a factor that the district court should consider in determining whether Phillips was diligent.

IV

In conclusion, the district court erred by not considering all of the relevant circumstances, including the differences between this case and *A.Q.C.*, in determining that Phillips's lawyers

---

[7] This is not to say the government needs to prove that a plaintiff's lawyer knew or should have known about the HHS online database or toll-free hotline. If a lawyer has reason to suspect that a health provider might be a government employee, there may be other steps that the lawyer would be required to take even if he does not know about the government's publicly available sources. However, the lack of evidence on this point is certainly a factor that the district court should consider on remand.

lacked diligence. We offer no view as to the ultimate outcome. Rather, we are simply not confident that we can properly evaluate on this record, without further consideration by the district court, whether the district court acted within its discretion and whether Phillips and his lawyers lacked diligence. We therefore remand to the district court for reconsideration under our clarification of the governing legal standard and for further proceedings consistent with this Opinion. In doing so, however, we do not imply that any one of the differences between this case and *A.Q.C.* is dispositive, and we express no opinion concerning whether the plaintiff's lawyers were diligent, or whether equitable tolling should ultimately be granted.[8] Phillips must still demonstrate that the circumstances of his case were sufficiently "extraordinary" to warrant equitable tolling and that he exhibited sufficient diligence.[9] *See Doe*, 391 F.3d at 159. The district court remains in the best position to exercise the discretion necessary to answer these questions, and it may still be that upon reviewing all of the relevant evidence, the court would be within its discretion to deny equitable tolling.

## CONCLUSION

Accordingly, for the foregoing reasons, the judgment of the district court is **VACATED** and the case is **REMANDED** for proceedings consistent with this Opinion.

---

[8] We also reiterate that we do not decide whether FTCA's statute of limitations is jurisdictional and, hence, whether equitable tolling is ever available under the FTCA.

[9] The district court found that, even if Pegalis sufficiently investigated the claim, Phillips and his family still demonstrated a lack of diligence because they did not begin to pursue the claim "in earnest" until July of 2010, over a year after Cato's death. *Phillips*, 2012 WL 3580532, at *10. However, the government has forfeited this issue by failing to raise it on appeal and, in any event, we disagree with the district court. The plaintiff and his lawyers faced a number of challenges posed by Deshong's overseas military service and still filed the lawsuit within the Connecticut statute of limitations, which they thought was the relevant deadline.